**GEARHART INDUSTRIES, INC., a Texas Corporation, et al.**

v.

**SMITH INTERNATIONAL, INC., a Delaware Corporation**

v.

**TEXAS AMERICAN/FORT WORTH, N.A., Trustee, et al.**

**Civ. A. No. 4–84–152–E.**

United States District Court,
N.D. Texas,
Fort Worth Division.

June 5, 1984.

Law, Snakard, Brown & Gambill by Thos. H. Law, Robert M. Randolph, Robert F. Watson, Fort Worth, Tex., Cantey, Hanger, Gooch, Munn & Collins by Robert S. Travis, Fort Worth, Tex., for plaintiff.

Fried, Frank, Harris, Shriver & Jacobson, Milton R. Ackman, Alan J. Russo, New York City, Kelly, Appleman, Hart &

Hallman, Dee Kelly, Forth Worth, Tex., for plaintiff.

Shank, Irwin & Conant, Ivan Irwin, Jr., A.B. Conant, Jr., Robert B. Cousins, Jr., Brett A. Ringle, Dallas, Tex., Skadden, Arps, Slate, Meagher & Flom, New York City, Hughes, Hubbard & Reed, Los Angeles, Cal., for defendants.

Kilgore & Kilgore by W. Stephen Swayze, Robert M. Thornton, Dallas, Tex., for Gruss Partners.

## MEMORANDUM OPINION

MAHON, District Judge.

On April 18, 1984 plaintiffs, Gearhart Industries, Inc., Marvin Gearhart, Troy P. Wakefield, Earl Collins and Donald E. Mahrt, on behalf of all owners of the Common Stock of Gearhart Industries, Inc., except Smith International, Inc. and Albert M. Birnie (hereinafter Gearhart), filed the above-captioned case to enjoin a proposed tender offer by the defendant, Smith International, Inc. (hereinafter, Smith) alleging that Smith had committed acts in violation of sections 10(b), 13(d), 14(d) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e); Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (hereinafter RICO); had engaged in fraudulent conduct in violation of state law; misused confidential information; breached various alleged agreements and breached an alleged fiduciary duty to Gearhart; and violated Section 7 of the Clayton Act, 15 U.S.C. § 18. Smith filed a counterclaim against Gearhart and added a number of third party defendants under § 14(d) and § 14(e), 15 U.S.C. § 78n(d) and § 78n(e), and Rules 14d–9 and 14e–2 promulgated by the S.E.C. This case is currently before this Court on Gearhart's and Smith's motions for preliminary injunctions. An evidentiary hearing was had lasting nine days. On the motions the parties rely on affidavits, depositions and on facts developed at said hearing.

This Court has jurisdiction of this action under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, 28 U.S.C. §§ 1331(a), and 1337. The state claims fall under the Court's pendent jurisdiction. Venue is proper in the Northern District of Texas.

## I. Background

Gearhart is a corporation organized under the laws of the state of Texas and has its principal place of business in Tarrant County, Texas, located in the Northern District of Texas, Fort Worth Division. Gearhart is engaged in the business of providing evaluation services in connection with the drilling and completion of oil and gas wells and of manufacturing and selling equipment and supplies which are required to perform well evaluation. It has approximately 16,017,626 shares of common stock issued and outstanding. The common stock of Gearhart is listed and traded on the New York Stock Exchange and the Midwest Stock Exchange and has been registered for such purpose pursuant to Section 12 of the Securities Exchange Act, 15 U.S.C. § 78*l*.

Defendant Smith is a corporation organized and doing business under the laws of the state of Delaware, with its principal place of business in the state of California. Smith transacts business in the state of Texas as a foreign corporation under a Certificate of Authority issued by the Texas Secretary of State. Smith is an oil field service company whose divisions and subsidiaries provide such products and services as oil well drill bits, drill string and down hole motors and directional services for use in the drilling and completion of oil and gas wells. Smith currently owns 33.2% of the common stock of Gearhart.

Smith and Gearhart have discussed the possibility of a business combination between the two companies since at least 1970. During 1982 and 1983, General Electric Venture Capital Corporation (hereinafter GE), a wholly owned subsidiary of General Electric Company, acquired 3,640,-514 shares of Gearhart common stock, representing approximately 23% of Gearhart's

outstanding common shares (sometimes hereinafter referred to as "the GE block"). During 1983, GE informed Marvin Gearhart, Gearhart's chairman and chief executive officer, of GE's interest in effecting a business combination with Gearhart, and perhaps acquiring the remaining shares of Gearhart common stock. GE sent personnel to the Gearhart plants and offices to conduct audits and to assist Gearhart in some management problems it had been experiencing. Mr. Gearhart told the Gearhart board of his talks with GE, and the board suggested that other possible purchasers, including Litton and Hughes Tool, be contacted to determine if they had any interest in Gearhart. Albert Birnie, a director on both the Gearhart and Smith boards, suggested that Smith might be interested in a merger with Gearhart. He caused Jerry Neely, Smith's chairman and chief executive officer to call Mr. Gearhart.

Neely and Mr. Gearhart met on August 23, 1983 to discuss a possible combination of the two companies. At that meeting, they discussed a merger ratio of 1.1 Smith shares per one Gearhart share. Mr. Gearhart gave Neely a draft five-year strategic plan dated August 15, 1983, which Gearhart had prepared at the behest of GE. Mr. Gearhart was skeptical of the plan, indicating that implementing such plans was more difficult than drafting them. Shortly after this initial meeting, Smith hired Morgan, Stanley & Company, Inc., (hereinafter Morgan Stanley) to act as its investment banker with respect to the possible acquisition of Gearhart. An internal acquisition team also was assembled. Both Morgan Stanley and Smith's own team began extensive analyses of Gearhart. Thereafter, Mr. Gearhart and Neely spoke on the telephone and the merger ratio was raised to 1.125 of Smith shares per one Gearhart share. Mr. Neely told Mr. Gearhart that he believed that some degree of cooperation from GE would be necessary for any possible transaction and received Mr. Gearhart's permission to talk to GE. Negotiations ensued concerning a possible three-way transaction, with talk of GE buying out both Smith and Gearhart or a myri-

ad of other possibilities. GE made several proposals to buy Gearhart's remaining stock, but no formal offer was made. However, in mid-October 1983, in negotiations secret from Gearhart, Smith arranged to buy the GE block for $31 per share. The Smith board voted on October 17, 1983 to accept the proposal and also formally authorized the purchase of up to 35% of Gearhart stock. Mr. Gearhart found out through GE that GE had sold its Gearhart stock; he was also notified because Smith filed a request on October 24, 1983 pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (hereinafter HSR), to acquire over 25% of Gearhart. Smith could not actually purchase the GE block for almost a month, pursuant to HSR. Mr. Gearhart stated that he was glad to be rid of GE as a major stockholder because some problems had developed in the GE-Gearhart relationship. On October 24, 1983 Smith and Gearhart issued a joint press release which stated that Gearhart welcomed Smith as a major stockholder.

On October 31, 1983, Smith filed a Schedule 13D with the Securities and Exchange Commission (hereinafter SEC). On the form, under Item 4, Smith indicated that it had acquired the GE block "for the purpose of acquiring a significant investment" in Gearhart. Smith stated on the form that it:

> intends to review on a continuing basis its interest in [Gearhart] and, depending upon its evaluation of [Gearhart's] operations and prospects and upon market conditions and future developments (including without limitation other business opportunities, developments with respect to the business and operations of Smith, general economic conditions as well as regulatory conditions), Smith may determine to increase its position in [Gearhart].

On November 23, 1983, Smith filed its First Amendment to the Schedule 13D, in which it announced that Smith's purchase of the GE block had been consummated on November 22, 1983. Amendment No. 1 made no change in the text of Item 4.

On November 30, 1983, Neely attended a portion of a Gearhart board meeting at which he stated that the two companies should endeavor to find areas in which each could help the other. He stated that Smith might in the future decide to acquire 100% of Gearhart, but that was not Smith's objective at that time. At that meeting, Mr. Neely received a Gearhart budget prediction. He also was given a revised five-year strategic plan of Gearhart's, dated October 1983.

On December 12, 1983, Smith bought another 202,500 shares of Gearhart stock at $21 per share from Jeffries & Co., a brokerage house specializing in the trading of blocks of shares. Mr. Neely telephoned Mr. Gearhart prior to the purchase, telling Mr. Gearhart that a block had been offered to Smith and that Smith intended to accept the offer. On that same day Smith filed its Second Amendment to its Schedule 13D, disclosing that it had increased its position in Gearhart to 24.2%. The text of Item 4 was not altered. On or about December 28, 1983 Smith again purchased Gearhart stock from Jeffries. Smith bought 130,000 shares at a price of $21 per share. After the transaction had been consummated, Mr. Russell of Smith notified Mr. Banks, Gearhart's chief financial officer.

Mr. Neely attended Gearhart's January 31, 1984 board meeting. He received Gearhart's eleven month financial results. At the meeting the atmosphere between Neely and Mr. Gearhart was somewhat strained and Neely was asked to consider signing a standstill agreement by which Smith would agree to halt purchasing Gearhart stock. Mr. Neely refused. Thereafter, in February 1984, Gearhart hired an investment banker and New York counsel specializing in mergers and acquisitions. At the suggest of Albert Birnie, during March 1984 Max Mosely from Gearhart and Edward Williams from Smith met on two occasions to discuss cooperative ventures by the two companies, but no such ventures were undertaken. At a March 16, 1984 meeting, Mosely offered on behalf of Gearhart to trade Gearhart's Measurement-While-Drilling (hereinafter MWD) division and cash for Smith's shares of Gearhart stock. The proposal was declined by Smith. On March 19, 1984 Smith bought an additional 16,000 shares of Gearhart stock on the open market at approximately $24 per share. Then, on March 21, 1984 Mr. Neely attended a meeting with Mr. Gearhart and Mr. Law, a Gearhart director, at which time Neely again was asked to sign a standstill agreement. Neely stated that he would do so only if it was a step in putting the two companies together. Mr. Gearhart and Mr. Law stated that Gearhart might try to seek injunctive relief which Mr. Neely later stated he regarded as "having the gauntlet thrown." On March 30, 1984 representatives from Smith met with representatives from Security Pacific National Bank (SPNB) and requested a change in the net worth covenant of its credit agreement with the bank, in order to allow Smith to purchase more shares of Gearhart stock.

Mr. Neely and Mr. Gearhart attended a conference in Washington, D.C. in April and on April 2, 1984 Mr. Gearhart presented Neely with the draft of a standstill agreement which Gearhart counsel had prepared. Mr. Gearhart admitted to Neely that the proposal was onesided and encouraged Mr. Neely to discuss the agreement with Smith counsel in an effort to reach an agreement acceptable by both sides. Neely never showed the draft to Smith counsel. In numerous open market transactions on April 4, 5 and 6, 1984 Smith bought another 255,700 shares of Gearhart stock at prices ranging from $25.50 to $27 per share. On April 10, 1984 Smith filed its third amendment to its Schedule 13D in which it disclosed that "Smith intends to purchase additional Common Shares, from time to time, in open market and/or privately negotiated transactions, by tender offer or otherwise." Smith also stated that it "intends to seek to exert its influence on the management and policies of [Gearhart], including with respect to a possible business combination of the two companies." At this point Smith held 26.5% of the outstanding Gearhart stock.

On Thursday, April 12, 1984 Smith made a firm bid to purchase 1,033,000 shares of Gearhart stock from Kemper Financial Services, Inc. (hereinafter Kemper) which Smith agreed to hold open until Monday, April 16, 1984. Gearhart representatives were not aware of the offer. On April 12 and April 13, Gearhart's investment banker, Chris Anderson of Drexel Burnham Lambert, Inc. (hereinafter Drexel Burnham), spoke with Eric Gleacher and John Risko of Morgan Stanley, who were Smith's investment bankers. Anderson proposed that they meet to discuss possible solutions to what he considered to be a crisis situation between the two companies. He asked Mr. Risko to agree to a halt in Smith's purchases of Gearhart stock pending such a meeting, agreeing not to shop the company during the standstill. Mr. Risko communicated this request to Smith management and secured an agreement. Risko told Mr. Anderson that there was no need to rush a meeting between the bankers in view of the standstill agreement and agreed to meet the following Tuesday morning, April 17, 1984. At the meeting Anderson proposed that Gearhart buy back the Gearhart shares held by Smith. Morgan Stanley had prepared no proposals but agreed to telephone Anderson later that day regarding Anderson's proposal. Anderson was telephoned that afternoon and Morgan Stanley stated that Smith had rejected the Anderson proposal and was not interested in any standstill agreement. On April 16, 1984, the previous day, Kemper had accepted Smith's bid and thus Smith at the time its bankers met with Gearhart's bankers owned over 33% of Gearhart's shares. Gearhart initiated this litigation on April 18, 1984, in both state court and this forum. On April 18, 1984 state district judge Wright issued a temporary restraining order in favor of Gearhart, *ex parte*.

On April 18, 1984 the board of directors of Gearhart authorized the issuance and sale of senior subordinated debentures and accompanying warrants to institutional investors. The board authorized corporate management to consummate the transaction. Negotiations with respect to the sale were completed on Tuesday, April 24, 1984 and on April 27, 1984 the sale took place in California. The subordinated debentures were in the aggregate amount of $98,700,-000 and the warrants allowed the purchase of 2,961,000 newly issued shares of stock. Gearhart received approximately $73,000,-000 from the sale, before deducting commissions and other expenses. Also on April 27, 1984 a state district judge modified the temporary restraining order in effect by allowing Smith to make a tender offer. Soon after the modification, on April 27, 1984, Smith announced its intention to commence its tender offer for Gearhart stock. During the afternoon of April 27, Gearhart and Smith appeared before this court at which time Gearhart requested a temporary restraining order halting the proposed tender offer. Gearhart's application was denied on April 28, 1984.

On April 30, 1984 Smith made its partial tender offer, offering to buy 3,700,000 shares of Gearhart stock at $31 per share. If successful, the tender offer will give Smith over 50% of the outstanding shares of Gearhart stock, if the warrants issued with the debentures are not exercised. Also on April 30, 1984 Smith brought suit in state court in California seeking to cancel the debenture/warrant transaction alleging that their issuance constituted a breach of management's fiduciary duties and a waste of corporate assets. A temporary restraining order was issued which lasted until May 8, 1984. A stay was denied by the California Supreme Court on May 9, 1984. The Gearhart board unanimously ratified the debenture/warrant transaction on May 3, 1984. Prior to the hearing in this matter both the Texas state court and California state court claims were added to the claims already asserted in this action, the out-of-state institutional investors having submitted to this Court's jurisdiction.

In the Fifth Circuit, a plaintiff is entitled to preliminary equitable relief upon showing:

(1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial

threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendant; and (4) that granting the preliminary injunction will not disserve the public interest. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 567–73 (5th Cir.1974). None of the four prerequisites has a fixed quantitative value, rather, a sliding scale is utilized which takes into account the intensity of each factor in a given calculus. *State of Texas v. Seatrain International, S.A.*, 518 F.2d 175, 180 (5th Cir.1975). Courts have recognized that entry of a preliminary injunction to preserve the *status quo* is an appropriate measure to avoid the possibility that the effects proscribed by Section 7 of the Clayton Act may result during the pendency of the action. *Grumman Corp. v. LTV Corp.*, 665 F.2d 10 (2d Cir.1981); *United States v. Wilson Sporting Goods Co.*, 288 F.Supp. 543 (N.D.Ill.1968).

### II. Gearhart's Preliminary Injunction Application

#### A. *The Antitrust Claim*

One of Gearhart's contentions is that an acquisition of Gearhart by Smith will violate the Clayton Act. Plaintiffs filed their complaint under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to prevent and restrain violations by Smith of Section 7 of the Clayton Act, 15 U.S.C. § 18. Gearhart alleges that an acquisition of Gearhart by Smith will violate the Clayton Act because both companies are engaged in the Measurement-While-Drilling (MWD) business and a combination of the two companies will substantially lessen competition in that area of oilfield services.

The relevant inquiry under Section 7 of the Clayton Act is to determine whether an acquisition by Smith of the stock of Gearhart "may be substantially to lessen competition, or tend to create a monopoly" in the MWD service market.[1] The statute was "designed to arrest in its incipiency ... the substantial lessening of competition" due to the takeover of one company by another. *United States v. E.I. duPont deNemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). It provides:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

The first inquiry in any Section 7 case is to define the relevant market, both product and geographic. *See United States v. Aluminum Company of America*, 377 U.S. 271, 273, 84 S.Ct. 1283, 1285, 12 L.Ed.2d 314 (1964). Only after the scope of the market is defined can the court determine which parties are competitors and what effect an acquisition would have on competition in the defined market.

The factors generally used for the determination of relevant product markets were

---

1. Smith claims that Gearhart does not have standing to proceed with its antitrust claim, relying primarily on three cases: *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Carter Hawley Hale Stores, Inc. v. The Limited, Inc.*, 587 F.Supp. 246 (C.D.Cal.1984); and *Central National Bank v. Rainbolt*, 720 F.2d 1183 (10th Cir. 1983). The Court finds each of the above cases materially distinguishable from the case at hand. *Brunswick* involved a claim for *damages* under the antitrust laws on a novel theory. *Carter Hawley* dealt with a tender offer for 100% of the target's stock, and thus the target would cease to exist after the tender offer. Smith only seeks to possess approximately 56% of Gearhart, thus Gearhart will still exist as an entity after the tender offer. In *Central National Bank* the putative acquirer was an individual shareholder. The Fifth Circuit has not yet addressed this specific issue. The Court prefers to follow the long line of cases which have allowed target companies to raise antitrust violations. *See, Grumman Corp. v. LTV Corp.*, 665 F.2d 10 (2d Cir.1981); *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315 (N.D.Ohio), *affirmed*, 669 F.2d 378 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); and *Whittaker Corp. v. Edgar*, 535 F.Supp. 933 (N.D.Ill.), *affirmed*, No. 82–1305 (7th Cir.1982).

outlined by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In *Brown Shoe* the Supreme Court stated that although "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," that market may be composed of various well-defined submarkets for antitrust purposes. *Id.* at 325, 82 S.Ct. at 1523. The Supreme Court also outlined various "practical indicia" to aid in identifying the relevant product market: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *Id.*

■ Measurement-While-Drilling (MWD) is a recent oilfield technology used primarily in the drilling of directional developmental wells. It measures downhole directional parameters during drilling without the use of a wireline or other connection to the surface. The downhole system transmits information to surface computers and the data is translated to aid the drill operator in the drilling process. MWD appeared on the market in 1978. Before the advent of MWD other directional tools were employed, such as the single-shot, multi-shot, and the wireline steering tool. These tools are still used in the oil industry. The advantage that MWD has over all these methods is that only MWD can provide real time information during rotary drilling. The single-shot and multi-shot are the least expensive of the tools, but they cannot be used during the actual drilling process and thus they result in down-time on the rig. Wireline steering tools most closely resemble the MWD in that they do provide real time directional data, but they can only do so when a downhole mud motor is being utilized, not during rotary drilling. MWD is frequently used on large, expensive rigs to avoid the down-time that would be incurred if traditional survey tools were used. Defendant's expert, Dr. William

Myslinski, testified that MWD is the clear choice for operators on some rigs. The MWD is cheaper to use than wireline steering tools but much more expensive than survey tools. MWD service is considered to be a distinct service at the industry level and within companies as well. Smith's Datadrill division bills itself as "The Directional, Survey and MWD Company." At least one company, Teleco, engages only in MWD business and in no other oilfield services. Because of the aforementioned reasons, the Court finds that the relevant product market in this case is MWD.

■ The next step is to define the relevant geographic market. The geographic market selected must correspond to the commercial realities of the industry and be economically significant. *Brown Shoe, supra* at 336–37, 82 S.Ct. at 1529–30. Gearhart presented some testimony to the effect that government regulations in foreign countries significantly affect a company's ability to offer MWD services in foreign countries, and thus the relevant market in this case should be limited to the United States. The Court disagrees. As Mr. Myslinski pointed out, the oil services industry is clearly worldwide and no company's scope is limited to just the United States market. Gearhart's own advertisements and other documents show that Gearhart clearly intends for its MWD service to be worldwide in scope. In addition, the Department of Justice guidelines suggest that courts look to where the company sells its wares or services as an aid in determining the relevant geographic market. Gearhart and the other companies selling MWD services sell in all the oil-producing regions of the world. Accordingly, based on the reasons discussed above, the Court finds that the relevant geographic market in this case is the world.

■ The next step is to determine the probable effect an acquisition by Smith of Gearhart would have on the worldwide MWD market. In a horizontal merger, the principal criteria for determining the probable effect of the merger are the market

shares of the two companies involved and the level of concentration in the industry. *See United States v. Pabst Brewing Co.*, 384 U.S. 546, 550–52, 86 S.Ct. 1665, 1068–69, 16 L.Ed.2d 765 (1966); *United States v. Continental Can Co.*, 378 U.S. 441, 458, 84 S.Ct. 1738, 1747, 12 L.Ed.2d 953 (1964). In order to calculate the market share held by Smith and Gearhart and the other companies in the MWD business, a measurement system must be chosen. Gearhart relies exclusively upon market shares and concentration statistics expressed in terms of MWD units, to support its claim of Clayton Act violation. Market share and concentration statistics frequently have been used by courts to predict the competitive effect of a proposed acquisition, but the Supreme Court has warned that statistical analysis is not a substitute for "examination of the particular market—its structure, history, and probable future ...." *United States v. General Dynamics Corp.*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974). Smith contends that revenues are a more accurate measure of market share in this case. The Court finds that neither revenues nor units are the best measure of market share. Rather, as testified to by Mylinski and Quinton, utilization, and therefore, capacity of the equipment is the most accurate measure. However, since no capacity figures are available, the Court finds that revenues are the next best measure. Because MWD is such a new business, it seems that the number of units a company possesses means little if that company is not recognized by the industry or if there are problems with the systems they possess. Revenues are a better indicator of market acceptance and use in this case. It is only when one assumes that each unit is functional and used to the same extent that the number of units possessed by any one company would give any indication of its market share. The evidence is clear that not all units in the industry are functional and that utilization rates vary between regions. Accordingly, the Court finds that revenues will serve as a better indicator of market share than units in this case.

Gearhart is the second ranked MWD company with total revenues for the fiscal year ending January 31, 1984 at approximately $14 million. On some internally generated documents, Smith rated itself as seventh of seven companies in the MWD business. It posted no revenues in the year 1983 and to date in 1984 has received $22,000 in MWD revenues and has invoiced another job for $32,000. Both jobs were performed in the last two months. Because Smith's MWD has generated some revenues it technically is an actual competitor of Gearhart. However, from the practical standpoint, which is the view favored in *General Dynamics, supra,* the Court finds that Smith is not yet a viable competitor of Gearhart's. Accordingly, the focus must be on the potential competitiveness of Smith.

The Fifth Circuit in *Mercantile Texas Corp. v. Board of Governors,* 638 F.2d 1255 (5th Cir.1981) enumerated four findings required to be made in the use of the potential competition doctrine: (1) market concentration; (2) other potential competitors; (3) probability of procompetitive entry; and (4) effects of independent entry. *Id.* at 1266–70. As the Supreme Court stated, "[t]he potential competition doctrine has meaning only as applied to concentrated markets." *United States v. Marine Bancorporation,* 418 U.S. 602, 630, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974). At present there are approximately seven companies that offer MWD services. That small number may on its face indicate concentration, but one must keep in mind that MWD is an infant industry. Moreover, anticompetitive behavior cannot be presumed from high concentration. *Republic of Texas Corp. v. Board of Governors,* 649 F.2d 1026, 1044 n. 32 (5th Cir.1981). As the Fifth Circuit stated, [i]f the market is competitive, collusion or conscious parallelism cannot affect the availability of ... services." *Mercantile Texas, supra* at 1266. Smith's expert, Mr. Myslinski, found that the MWD market was highly competitive. More importantly, Gearhart's own employees stated that the MWD business was a

"dog eat dog" situation. Mr. Hale stated that new technology and new competition seemingly arrived on the market every day.

The next required finding is a determination of any other potential competitors. If there are numerous potential competitors waiting in the wings, eliminating Smith as one potential entrant would not be significant. *Mercantile Texas, supra* at 1267. The evidence shows that both Sperry-Sun and Teledrill are known to be testing MWD systems. In addition, Scientific Drilling Inc. and Dresser Industries have developed prototype MWD systems. Mr. Mosely, of Gearhart stated that to get into the MWD business a company need be in the oilfield service business already, have a good sales force, and have a large amount of research and development funds available. The Court finds that although there may be high barriers to entry in this area, a number of firms have cleared the barrier and it is clear that a significant number of firms have the capability to clear the barrier or are in the process of so doing.

Next, the Court must determine the probability of procompetitive entry by Smith independent of any acquisition of Gearhart. The record clearly shows that Smith has derived some revenues with its MWD system recently and that Smith has set aside significant funds for its MWD project. There is no indication that Smith would scrap its plans if prevented from acquiring Gearhart. The fourth finding is the procompetitive effects of independent entry, if any. The Court finds that an independent entry by Smith into the MWD market would not significantly deconcentrate the market. However, because of the previous finding of the competitive nature of the MWD business, the fact that Smith will not deconcentrate the market appears irrelevant. A small addition to existing competition will not suffice if its absence would not substantially lessen future competition. *Mercantile Texas, supra* at 1270. Smith's independent entry is unlikely to have a significant impact unless it eventually accumulates a market share sufficient to challenge the dominance of established firms. *See Marine Bancorpora-*

*tion,* 418 U.S. at 632–39, 94 S.Ct. at 2875–78. Given the high competitiveness of the MWD business and the constantly emerging new technologies by which each firm tries to become more reliable and to provide more and different kinds of information through its MWD systems, it seems unlikely at this juncture that Smith will accumulate a large share of the market in the foreseeable future.

■ In summation, a review of all the evidence in this case, the briefs submitted by each side, and the applicable law necessitates a finding by this Court that Gearhart is not likely to prevail on the merits of its antitrust allegations. The Court also finds that although granting a preliminary injunction will not disserve the public interest and the plaintiff will suffer some irreparable injury and the threatened harm to the plaintiff is greater than that which would threaten the defendant if an injunction issued, because the Court finds that it is clear that the plaintiff will not prevail on the merits of its antitrust claim, a preliminary injunction is not warranted on that basis.

B. The Securities Claims

1. 13(d)

Gearhart also contends that it is entitled to a preliminary injunction based on its allegation that Smith failed to disclose in a number of its Schedule 13D filings that its purpose in acquiring Gearhart stock was eventually to control Gearhart. The Court finds that the totality of the evidence presented substantiates Gearhart's claim that Smith intended to gain control of Gearhart long before it disclosed that intent in its April 10, 1984 amendment to its Schedule 13D.

The evidence in this case establishes the following:

(1) The two companies have considered some form of business combination since 1970. In 1977, Smith proposed a stock-for-stock transaction which was rejected by the Gearhart board. In the summer of 1983,

Mr. Neely and Mr. Gearhart again began discussing a business combination.

(2) In August 1983 Smith hired Morgan Stanley to act as its investment banker with respect to a possible acquisition of Gearhart. The confirmation letter stated that "Morgan Stanley ... will be engaged by Smith ... to assist it in the acquisition of a company known to both of us as Robot Company ...." (PX 50). Mr. Neely testified that Robot Company was Smith's code name for Gearhart.

(3) Morgan Stanley, along with an internal team in Smith produced extensive analyses of Gearhart, utilizing in part Gearhart's Strategic Plan, under two code names—Project Robot and Project Timber. (PX 52, PX 59).

(4) While Smith, GE and Gearhart were involved in three-way negotiations regarding a possible business combination of the three companies, Smith also engaged in negotiations with GE alone, in an effort to acquire GE's block of Gearhart stock. These negotiations were kept secret from Gearhart. One Smith document cautioned —"no notification of Marvin [Mr. Gearhart] until a purchase agreement is signed." (PX 67).

(5) On October 17, 1983 the Smith board met and a presentation was distributed entitled "An acquisition plan to provide total information systems capabilities to Sii [Smith]." "The candidate" was Gearhart, and a chart developed by Smith showed an analysis of market position with Smith and Gearhart combined. Under the title "Acquisition Objectives" was listed "Control of GI [Gearhart]—eventually moving to 100%." (PX 61). At that meeting, the Smith board authorized the purchase of the GE block and also formally authorized the purchase of up to 35% of Gearhart stock, which would give Smith a "blocking position" in Gearhart. (PX 62).

(6) On October 31, 1983, Smith filed a Schedule 13D, disclosing the GE purchase. Under the section entitled "Purpose of Transaction," Smith stated that it had made the purchase "for the purpose of acquiring a significant investment" in Gearhart. It stated that "depending on future developments" Smith "may determine to increase its position ...." (PX 5).

(7) After the acquisition, Smith continued to analyze and evaluate different strategies in regards to Gearhart. A briefing memo, dated November 10, 1983, from Ed Williams who was assigned by Neely to work on the Gearhart project, identified an objective of "purchasing additional GI stock to build a 30 + % level." (PX 90). The memo identifies a tactical action which Mr. Williams thought was necessary to execute the objective—"as soon as HSR [Hart-Scott-Rodino filing] clears, begin to purchase GI stock." (PX 90).

(8) A "strictly confidential" November 22, 1983 memorandum to Mr. Neely from Dennis Leibel, Smith's vice president of finance, stated under the heading "Action," "finalize strategy and implement—Re: open market purchase program, timing and goals." (PX 70).

(9) On November 23, 1983, Smith filed its first amendment to its Schedule 13D, disclosing that the GE block purchase had been consummated. Smith did not revise Item 4 of that form regarding the purpose of the transaction.

(10) On that same day Mr. Neely sent a letter to Mr. Gearhart listing four options open to the two companies, three of which involved Smith acquiring more of an interest in Gearhart, including the possibility of Smith purchasing additional shares in the open market. (PX 9). More importantly, a previous draft of that letter was not sent, (PX 9A) and had scrawled on the front of it "Revise re: 13D." Mr. Neely testified that he had been advised not to send that draft because its contents did not coincide with Smith's 13D.

(11) On November 28, 1983 Ed Williams and other Smith officials met and Williams' notes indicate that "we do not want a revised 13D. Therefore, we ... should not enter into any agreement requiring public disclosure prior to mid-February 1984." (PX 72).

(12) On November 30, 1983 Mr. Neely attended a Gearhart board meeting. He stated that Smith might in the future acquire 100% of Gearhart, but that was not Smith's objective at that time. Mr. Neely assured Gearhart that no hostile action was contemplated. Mr. Dorsey, a Gearhart director and former chairman of Gulf Oil, testified that because of Mr. Neely's assurances, Gearhart decided against hiring Goldman Sachs, an investment bank, at that time.

(13) On December 12, 1983, Smith bought an additional 202,500 shares of Gearhart stock. Mr. Neely telephoned Mr. Gearhart prior to the purchase, stating that a block has been offered to Smith and Smith intended to accept the offer. That same day, Smith filed its second amendment to its Schedule 13D, disclosing that it had increased its holding in Gearhart to 24.2%. The text of Item 4 was not changed.

(14) In a memorandum dated December 16, 1983, Paul Russell summarized Smith's "current posture on open market purchases of Gearhart shares ...." He stated:

> We are willing to purchase approximately one million additional shares at a total cost of 20–22 million dollars over and above our initial purchase from G.E. Thus far we have purchased 202,500 shares.
>
> We are not actively seeking stock, and have no orders in the hands of brokers, but rather are "waiting in the bushes" should sizable blocks come to us at a reasonable price from whatever source. Our continuing interest will be reviewed again if we reach the one million share target, or if the Gearhart price moves above 23.
>
> Our objective is to increase our Gearhart ownership *without* driving up the price or over-extending our balance sheet.

(PX 91).

(15) On or about December 28, 1983 Smith again purchased Gearhart stock. Smith bought 130,000 shares at a price of $21 per share. After the sale was consummated, Paul Russell of Smith notified Mr. Banks, Gearhart's chief financial officer, of the purchase.

(16) In January, Mr. Gearhart was informed by a representative of Develco, that in 1983 Smith had acquired an 18% interest in Develco, with right of first refusal on the remaining shares. Develco manufactures downhole sensors utilized in Gearhart's and other companies' MWD systems. Mr. Neely had not disclosed this information to Mr. Gearhart.

(17) Mr. Neely attended Gearhart's January 31, 1984 board meeting and was asked to consider signing a standstill agreement, but no agreement was reached.[2]

(18) On March 19, 1984 Smith bought 16,000 shares of Gearhart stock on the open market at a price of approximately $24 per share.

(19) On March 21, 1984 Mr. Neely met with Mr. Gearhart and Mr. Law, another Gearhart director, and again was asked to sign a standstill agreement. Mr. Law and Mr. Gearhart indicated that Gearhart might seek injunctive relief. Mr. Neely later stated that he considered the tone of that meeting as "having the gauntlet thrown."

(20) On March 30, 1984, representatives of Smith met with representatives of Security Pacific National Bank (SPNB). The bank's report of that meeting contains the following information:

> Gubrud [of Smith] asked that we lower Smith's net worth requirement from $425mm to $350mm for 12 months. Smith hopes to acquire up to 100% of Gearhart Industries during this time .... Leibel [of Smith] mentioned that, possibly, after Smith acquires 51% of Gearhart, the acquisition can be accounted for on a consolidated basis rather than an equity basis.

(PX 310).

(21) On April 2, 1984 Mr. Gearhart presented Mr. Neely with a draft of a

---

**2.** The Court notes with interest that there was no significant activity on the part of Smith in February 1984, the month this Court issued its opinion in *Hughes Tool Co. v. Dresser Industries.*

standstill agreement and asked Mr. Neely to consider it with counsel in an effort to come to an agreement acceptable to both sides. No agreement was reached.

(22) In numerous open market transactions on April 4, 5, and 6, 1984 Smith bought another 255,700 shares of Gearhart stock, at prices ranging from $25.50 to $27.00 per share. On April 10, 1984 Smith bought another 21,500 shares.

(23) On April 10, 1984 Smith filed its third amendment to its Schedule 13D in which it disclosed that it held a 26.5% interest in Gearhart and that "Smith intends to purchase additional Common Shares, from time to time, in open market and/or privately negotiated transactions, by tender offer or otherwise." Smith also stated that it "intends to seek to exert its influence on the management and policies of [Gearhart], including with respect to a possible business combination of the two companies." (PX 15).

 Contrary to Smith's contention that its intent to seek to control Gearhart was not formulated until April 10, 1984, when it filed its fourth amendment to its Schedule 13D, the Court finds that the totality of the evidence currently before the Court, including exhibits not specifically referred to above, conclusively shows that Smith contemplated controlling Gearhart as early as October 31, 1983, when it filed its original Schedule 13D.[3] Even though the *strategy* Smith planned to use may not have been fixed, nonetheless, Smith's purpose was clear. Whereas Smith may have contemplated at first a friendly transaction, the evidence shows an effort on the part of Smith to formulate and carry out an acquisition plan, while keeping Mr. Gearhart and others at Gearhart unaware of its motives. More importantly, Smith's nondisclosure put holders of Gearhart stock at a disadvantage, forcing them to make buying and selling decisions without the benefit of the knowledge that Smith hoped to gain control of Gearhart.[4] The natural consequence of the nondisclosure is that the trading price of Gearhart did not rise as stock prices tend to whenever a bid for control is disclosed.

 Item 4 of Schedule 13D requires disclosure of a purpose to acquire control, even though this intention has not taken shape as a fixed plan. The Court recognizes that disclosure of *plans* for specific corporate changes can be misleading until the plans assume definite form. However, "[d]isclosure of a purchaser's *purpose* in acquiring stock is a different matter. Item 4 specifically requires disclosure of a purpose to acquire control, regardless of the definiteness or even the existence of any plans to implement this purpose." *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 247 (8th Cir.1979). *See also Riggs National Bank of Washington, D.C. v. Allbritton*, 516 F.Supp. 164, 175 (D.D.C.1981). Accordingly, the Court holds that Gearhart has shown a substantial probability of success on the merits of its claims that Smith engaged in conduct which is violative of section 13(d). The balance of the hardships indicates that Gearhart shareholders will suffer irreparable harm should equitable relief be denied. There also is strong public interest in furthering the policy of full and fair disclosure under the Williams Act.

 Smith contends that Gearhart cannot demonstrate that it will suffer irreparable harm in the absence of a preliminary injunction. It claims that even if Smith's previous 13D forms were misrepresentative of Smith's purposes, its April 10, 1984 filing, in which Smith disclosed its control intent, cured the defect.

---

**3.** Indeed, the cases discussed below have found intent to control with much less evidence than what is before this court.

**4.** Smith contends that because a number of business publications stated that a merger between Gearhart and Smith might come to fruition, the market and Gearhart shareholders were apprised of the possibilities. The Court finds that press articles are no substitute for information that is required to be disclosed on Schedule 13D. It is ludicrous to believe that shareholders more often rely on press articles than on official disclosure forms in making buying and selling decisions.

It is unquestioned by this Court that in some situations in which violations of 13(d) have been found, corrective disclosure has been held a sufficient remedy. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980); and *Chromalloy Companies, supra.* However, irreparable harm has been found where, as here, continuing material nondisclosures have been shown and the acquiror gained a substantial position in the target company's stock during the period of nondisclosure. *See Hanna Mining Co. v. Norcen Energy Resources, Ltd.*, 574 F.Supp. 1172 (N.D.Ohio 1982); *General Steel Industries, Inc. v. Walco National Corp.*, [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,402 (E.D.Mo.1981). In *Walco*, the court found that:

> [u]nless an injunction is issued, GSI and its shareholders, both those who presently own shares and those who sold during Walco's non-compliance with the requirements of Section 13(d) of the 1934 Act, will be irreparably harmed in that:
>
> (i) Walco's illegally obtained blocking position has placed it in a position to inhibit competing offers and has made it extremely difficult for GSI to arrange for a merger, business combination or to pursue other possible business opportunities which would be favorable to *all* GSI shareholders (as opposed to the 19 percent which Walco seeks). Once Walco controls GSI, it will have little, if any, incentive to pay a premium to the remaining GSI shareholders in a subsequent merger of GSI and Walco. In addition, Walco's acquisition of over 51% of GSI will reduce the liquidity of GSI stock held by the remaining GSI shareholders.
>
> (ii) The knowledge that Walco's ultimate purpose was to seek control of GSI may have led many shareholders who sold in the open market to hold onto such shares in anticipation of a higher price or to stay with the new entity. The stockholders that sold could not be compensated for the irretrievable loss of the opportunity to consider whether they wished to sell their shares at a time when a takeover was intended or whether they wished to facilitate, directly or indirectly, the acquisition by Walco of GSI.
>
> (iii) Shareholders who sold to Walco irretrievably lost their ability to obtain a control premium for their shares—a loss not compensable by a monetary award— and unwittingly sacrificed their right to knowingly determine who should be in a position to control GSI.

*Walco, supra* at 92, 418.

In *Walco*, the court enjoined Walco's tender offer pending rescission of all of the stock purchases made after Walco filed its false Schedule 13D, and divestiture of any of those shares still held after completion of the rescission offer. The case was settled before the Eighth Circuit had an opportunity to rule, however, while the appeal was pending, the SEC filed an *amicus curiae* brief, the thrust of which was released in SEC Litigation Release No. 9533, *reprinted in*, Fed.Sec.L.Rep. (CCH) ¶ 98,387 (Dec. 21, 1981) and provides as follows:

> The Commission urged in its brief that the district court's equitable jurisdiction to remedy Section 13(d) violations includes the authority to order any relief appropriate under the circumstances. The Commission expressed the view that equitable remedies in addition to corrective disclosure, such as rescission and divestiture, may be necessary or appropriate to remedy violations of the Williams Act, particularly in cases where the defendant deliberately violated Section 13(d) and the illegal conduct had permitted the defendant to obtain a sufficient number of shares to inhibit competing tender offers or merger proposals. In such cases, absent rescission or divestiture or other remedy removing the wrongfully obtained blocking position, shareholders could be irreparably harmed and the defendant would be permitted to benefit from its wrongful conduct.

Release, at 92, 344.

The court in *Hanna Mining, supra*, also ordered a divestiture remedy, having found

that the potential acquiror had obtained an unfair advantage over other potential offerors by reason of its 8.8% interest in the target's stock. It found that once the acquiror controlled the target, it would have no incentive to pay a premium to the remaining shareholders in the event of a subsequent merger. Additionally, the court found that the shareholders who had sold stock during the period of the false 13D had sacrificed their right to knowingly determine who should be in a position to control their company. 574 F.Supp. at 1197. It is that right that is not compensable by money damages.

In all material respects, the fact situations in both *Walco* and *Hanna Mining* mirror the facts in the case at hand. Smith has illegally obtained a blocking position in Gearhart. If Smith was permitted to obtain over 50% of Gearhart stock, as it will if its tender offer is successful, it would have little or no incentive to pay a premium to the remaining Gearhart shareholders in a subsequent merger of Smith and Gearhart. The knowledge that Smith's ultimate purpose was to gain control of Gearhart may have led some stockholders to make decisions different from those they did make. The shareholders who sold during the period of nondisclosure lost more than just a premium price for their stock, they irretrievably lost their ability to *knowingly* decide who should be in a position to control Gearhart. The directors of Gearhart also lost their ability to combat at an earlier stage the advances made by Smith.

Formulation of an appropriate remedy must await final hearing on a permanent injunction, however, the extensive evidence that the Court has already received supports Gearhart's motion for a preliminary injunction and the rescission and divestiture remedy that it requests. This remedy seems as appropriate, if not more, here than in the cases of *Walco* and *Hanna Mining*, discussed above. Any different result would mean that Smith could engage in the most deliberate form of misrepresentation in its statutory filings and "get off the hook" simply by filing a corrective disclosure and paying damages, while keeping the benefits of its wrongful conduct. Accordingly, Gearhart's motion for a preliminary injunction restraining Smith from carrying out its tender offer is hereby GRANTED and an appropriate order will be entered.

### 2. 14(d) and 14(e)

Gearhart asserts that Smith has violated Sections 14(d) and 14(e) of the Securities Exchange Act, 15 U.S.C. § 78n(d) and § 78n(e) by failing to disclose sufficient information regarding Smith's potential liability in a California patent suit with the Hughes Tool Company in tender offer materials distributed to Gearhart's shareholders. Under Section 14(e) it is unlawful to include in a tender offer any untrue statement of a material fact or to omit any material fact necessary to make statements not misleading. A misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to accept the tender offer. *Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140, 1147 (2nd Cir.1979). This standard conforms to that adopted by the Supreme Court in the context of Rule 14a–9 violations in proxy contests in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The Hughes Tool litigation began with the institution of suit by Smith in California district court in 1972 seeking a declaration of invalidity with regard to Galle Patent No. 3,397,928 (the "'928 patent"), issued to Hughes as assignee. Hughes counterclaimed for damages, alleging that Smith had infringed both the '928 patent and Galle Patent No. 3,476,195 (the "'195 patent"), which was also issued to Hughes as assignee. The district court issued a declaratory judgment that both patents were invalid. However, the Court of Appeals for the Ninth Circuit reversed, finding both patents to be valid, reinstituting Hughes' counterclaim for infringement and remanding for further proceedings on the counterclaim. *Smith International, Inc.*

v. *Hughes Tool Co.*, 664 F.2d 1373 (9th Cir.1982), *cert. denied,* 456 U.S. 976, 102 S.Ct. 2242, 72 L.Ed.2d 851 (1982).

Upon remand Hughes moved for entry of judgment, alleging that Smith had admitted infringement of both patents. Smith had filed pleadings in the district court admitting the manufacture and sale of devices coming within the terms of the '928 and '195 patents but denying infringement on the sole basis that the patents were invalid. Hughes also sought a preliminary injunction against further infringement by Smith. The district court recognized Smith's admission of infringement but denied both motions, pending trial on damages. On appeal the Ninth Circuit reversed and remanded with instructions to issue a preliminary injunction enjoining Smith from infringing claim 1 of the '928 patent. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1580 (Fed. Cir.1983). The district court issued a preliminary injunction in accordance with the appellate court's order on December 13, 1983.

On February 10, 1984 Hughes filed a motion for contempt alleging that Smith's current drill bit production contains seals which infringe upon the Hughes patents. Trial on this motion has been set for September 1984. There also remains to be tried in California district court the extent and nature of the infringement and the scope of damages suffered by Hughes. This potential liability faced by Smith forms the basis of Gearhart's claims that its shareholders have not been provided sufficient information under Section 14(e).

Smith's disclosures to Gearhart shareholders regarding the Hughes Tool suit are contained in Sections 9, 12 and 13 of the tender offer materials and in Exhibit (a)(13) to Amendment No. 4 to Smith's Schedule 14D-1, which was filed with the Securities Exchange Commission on May 11, 1984.

In Section 9, which is captioned "Certain Information Concerning the Purchaser," Smith provides a history of the Hughes litigation. Also in Section 9 Smith provides Gearhart's shareholders with the text of a qualified opinion from its independent auditors, Arthur Andersen & Co., on March 15, 1984, in connection with Smith's 1983 Annual Report on Form 10-K. In Section 12, which is titled "Purpose of the Offer," Smith advises Gearhart's shareholders in general terms that damages that may be assessed in the Hughes case could affect whether Smith purchases additional Gearhart shares.

Sections 9 and 12 are cross-referenced to section 13, captioned "Certain Legal Matters," in which Smith reviews the claims made and remedies sought by Gearhart in actions filed in state and federal court. Section 13 states in part that in the federal court action Gearhart has asserted that Smith

... (e) concealed the alleged magnitude and impact that the Hughes Tool Action against the Purchaser had on its financial condition and its ability to finance the purchase of all of the outstanding shares.

In addition, Section 13 provides that in the action originally filed in Tarrant Country district court Gearhart alleged that Smith has violated the Texas Securities act by its

... (e) failure to disclose that the Purchaser faces enormously and potentially devastating liabilities arising out of the Hughes Tool Action which the Company alleges would have a material adverse impact on the Purchaser's net worth, financial condition and ability to obtain financing, among other things, to purchase all of the outstanding Shares ....

Finally, on May 11, 1984 Smith filed with the SEC Amendment No. 4 to its Schedule 14D-1. Attached as Exhibit (a)(13) to Amendment No. 4 was Smith's Supplement/Amendment to its tender offer, which was mailed to Gearhart shareholders. Under the heading "Litigation Developments" Smith included information concerning litigation between Smith and Gearhart since commencement of the offer.

Gearhart's claim that Smith has included misstatements and made omissions of material facts in the tender offer centers on

three allegations. Gearhart asserts that Smith should have advised Gearhart shareholders of the potential dollar range of damages which it faces in the Hughes litigation. Further, Gearhart asserts that Smith has failed to disclose the impact of the preliminary injunction on its drill bit production and earnings. Finally, Gearhart asserts that Smith should not have included a statement in Section 9 that it has meritorious defenses in the Hughes Tool case. Gearhart contends that any defenses raised by Smith in the Hughes litigation are known by Smith to be frivolous. It is Gearhart's contention that the combined effect of such misstatements and omissions is to mislead Gearhart's shareholders by minimizing the potential severity of the impact of the Hughes litigation on Smith's financial condition.

As stated above, a fact is material if it is substantially likely that a reasonable shareholder would consider it to be important in deciding whether to tender his shares. *TSC Industries, Inc. v. Northway, supra* 426 U.S. at 449, 96 S.Ct. at 2132.

Section 14(e) does not require that Smith predict the amount of damages to be assessed in the Hughes litigation. In *Securities & Exchange Commission v. Texas International Company*, 498 F.Supp. 1231 (N.D.Ill.1980) the court discussed the duty of a tender offeror to describe pending appeals which may have some effect on the tender offer. Texas International issued an invitation to shareholders in a publicly held bankrupt company to trade their claims for shares in the reorganized corporation. TI disclosed in its tender offer that appellate proceedings on the reorganization plan were pending, had a potential effect on the plan and could delay its consummation, but did not predict any specific impact on the plan contingent on alternative outcomes on appeal. The court held that TI satisfied Section 14(e) by describing the issues on appeal and stating that the appeal may affect the plan. The court stated:

> There is a tremendous difference between disclosing the likelihood of litigation and disclosing its probable result. The first is at least partially a function of objectively verifiable factors, ... The second is largely a speculative judgment .... We think of no method, short of divine inspiration, by which TI could have perceived a "reasonable likelihood" that the appeals would be decided one way or another.

*Id.* at 1249–50.

Although the Court concludes that Smith need not speculate on the outcome of the trial on damages in the Hughes litigation by predicting the specific amount of damages to be assessed, the Court finds a more basic problem with the information disclosed in the tender offer. Nowhere in the account of the Hughes litigation contained in Section 9 does Smith clearly advise Gearhart's shareholders that infringement of the Hughes patents has been admitted so that only the amount of damages remains to be determined. By stating that Smith and its counsel believe that it has meritorious defenses in the Hughes Tool action, Smith implies that the company may escape all liability to Hughes for infringement. This is simply not so. Any defenses presented by Smith can mitigate damages but are not a total defense to Hughes' counterclaim.

There is substantial case authority for the rule that where there is some contested issue of fact Section 14(e) requires only that the target shareholders be advised of the disputed facts and the possible outcomes. *Condec Corp., v. Farley*, 573 F.Supp. 1382 (S.D.N.Y.1983); *Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121 (S.D.N.Y.1980), *aff'd without opinion*, 659 F.2d 1057 (2d Cir.1981); *Copperweld Corp. v. Imetal*, 403 F.Supp. 579, 606 (W.D.Pa. 1975). This may be accomplished by inclusion in the tender offer of the target company's version of contested issues. Smith alleges that it has complied with Section 14(e) by including Gearhart's claims in Section 13 of the tender offer. However, while the amount of damages which may be assessed is open to speculation, the admission of infringement by Smith is not a contested fact upon which the parties may

disagree. The Court finds that the inclusion of Gearhart's claims in the tender offer does not correct the omission of this material information by Smith in Section 9 of the offer.

The Court has granted Gearhart's motion for a preliminary injunction restraining Smith from carrying out its tender offer, on the basis of Gearhart's claim of a violation of Section 13(d). In the alternative and in addition to that finding, the Court concludes that Gearhart has presented sufficient proof of the four factors enumerated in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 567–73 (5th Cir.1974), so as to entitle Gearhart to a preliminary injunction as a result of Smith's violation of Section 14(e). The Court finds a substantial likelihood that Gearhart will prevail on the merits of the claim that Smith has misled Gearhart's shareholders regarding the potential seriousness of the Hughes litigation by omitting a clear statement that Smith has admitted infringement in that case and now faces the assessment of some damages. Further, the Court finds that there is a substantial threat that Gearhart will suffer irreparable injury if the injunction is not granted because Gearhart's shareholders would be required to decide whether to tender their shares based on inadequate information and a misleading picture of Smith's financial condition. Finally, the Court finds that the threatened injury to Gearhart outweighs the threatened harm the injunction may cause Smith and that granting the injunction will not be against the public interest. The Court finds that no other objections to Smith's tender offer materials which have been raised by Gearhart constitute violations of Section 14(e).

### 3. 10(b)

Gearhart also contends that Smith is engaged in ongoing violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated by the SEC. Because of its finding in section (1) above, the Court finds it is unnecessary to determine whether Gearhart has standing to seek relief under 10b–5 or to reach the merits of those claims. This issue will be addressed after a hearing on the merits, if any.

### C. The State Law Claims

Gearhart contends that Smith breached an oral standstill agreement made between Gearhart's and Smith's investment bankers when it purchased the Kemper block on April 16, 1984. Mr. Anderson of Drexel Burnham testified that on April 12 and 13, 1984, he had conversations with Mr. Risko and Mr. Gleacher of Morgan Stanley, Smith's bankers. Mr. Anderson asked them to agree to a standstill whereby Gearhart would not "shop" the company in return for Smith's promise to cease buying Gearhart shares, pending a meeting between the investment bankers. Risko stated that he had to get clearance for such an agreement from Smith and would call Anderson back. Anderson testified that Risko later telephoned him and stated that he had received permission from Smith to make a standstill agreement. Anderson then attempted to make arrangements for a meeting as soon as possible, but testified that Risko had said that there was no need to rush the meeting due to the standstill. The two sides agreed to meet at 7:30 a.m. Tuesday, April 17, 1984. At that meeting Anderson proposed that Gearhart buy back the Gearhart stock held by Smith. The Morgan Stanley representatives had no proposals to offer but agreed to get back to Anderson prior to the close of business that day. Anderson testified that around 2:45 p.m. that day, he received a phone call from Morgan Stanley to the effect that Smith was not interested in Gearhart's proposal and would agree to no further standstill.

This testimony must be viewed with an eye to other events which were occurring at the same time. On April 12, 1984 Smith made its bid for the Kemper block and agreed to leave the bid open until Monday, April 16, 1984. Paul Russell of Smith handled the transaction. On April 16, 1984 the offer was accepted and therefore Smith

was the owner of more than 33% of Gearhart shares and held a blocking position at the time of the bankers' meeting although Gearhart did not become aware of the purchase until a week or so later. Mr. Risko's deposition indicates that he received clearance for a standstill from either Mr. Russell or Mr. Leibel at Smith. However, his account of the scope of the agreement differs from Mr. Anderson's understanding. Risko stated that he only agreed to call Morgan Stanley's risk arbitrage department and its block trading desk to tell them to get out of the market for Gearhart shares. Smith thus contends that its purchase of the Kemper shares violated no agreement that Morgan Stanley may have made with Anderson because the Kemper deal was a private transaction. Gearhart contends that if Anderson had not secured an agreement with Mr. Risko Gearhart would have filed for a temporary restraining order earlier than it had, thus perhaps enjoining the Kemper purchase.

The Court considers Mr. Anderson to have been a very credible witness and his testimony alone raises "serious questions going to the merits" of this breach of agreement claim. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568 (2d Cir.1981). Both Risko's deposition and Mr. Anderson's testimony indicate that some type of standstill agreement was made. The Court finds that it would have been in bad faith for Smith to agree merely to call its traders off the floor when all along it had a bid pending with Kemper. For these reasons, the Court finds that Gearhart has shown enough under this claim to entitle it to a preliminary injunction based on its likelihood of success on the merits and the balance of the harms. At this juncture the Court is inclined to believe that an agreement to cease all buying and to cease shopping Gearhart was made on April 12, 1984 and that based on what seems like a breach of that agreement, rescission and divestiture of the Kemper block may prove to be the only remedy which would compensate Gearhart and its shareholders.

Gearhart contends that Smith violated a fiduciary duty to Gearhart by using confidential information arising from Smith's participation in negotiations between Gearhart, GE and Smith to its own benefit in secretly negotiating with GE for the purchase of the GE block of 3,640,514 shares of Gearhart common stock. In September 1983 the three parties began holding discussions concerning a possible acquisition of both companies by GE. Such negotiations continued over a period of time, during which Smith was given Gearhart's Five Year Strategic Plan dated August 1983, which Smith passed on to Morgan Stanley, its investment bankers. Smith subsequently entered negotiations with GE which were concealed from Gearhart, and as a result Smith entered an agreement with GE on October 21, 1983 to acquire the GE block.

Although Gearhart asserts that a fiduciary duty arose when Gearhart gave Smith certain confidential financial information for use in negotiations between the companies and GE, the Court finds that such relationship did not become a fiduciary relationship as contemplated by law. To create a fiduciary relationship under Texas law the facts must show an extended period of dealing by parties who have worked together for a common goal, such as joint adventurers, partners, and attorney and client. To establish such a relationship the evidence must show that the dealings between the parties have continued for such a period that one party is justified in relying on the other to act in his best interest. *Gonzalez v. City of Mission*, 620 S.W.2d 918, 921 (Tex.Civ.App.—Corpus Christi 1981, no writ); *Thigpen v. Locke*, 363 S.W.2d 247 (Tex.1962). Subjective trust alone does not convert an arms-length relationship into a fiduciary relationship. *Thomson v. Norton*, 604 S.W.2d 473 (Tex. Civ.App.—Dallas 1980, no writ).

Although Smith and Gearhart had enjoyed a cordial relationship since 1970, the Court finds that their relationship did not involve an extended period in which they worked together toward a mutual goal. The record reflects that negotiations

between the parties concerning the creation of a joint business venture or a merger of the two companies commenced in earnest in August 1983 and did not reach fruition. Smith's agreement to purchase the GE block was made on October 21, 1983, some two to three months later. Accordingly, the Court finds no fiduciary relationship between the parties which is entitled to protection under Texas law. *Page Airways, Inc. v. Associated Radio Services Company*, 545 S.W.2d 184, 193 (Tex.Civ. App.—San Antonio 1976).

In addition, Gearhart's pleadings contain a claim that Albert M. Birnie, a common director on both the Gearhart and Smith boards, violated a fiduciary duty to the company by divulging confidential information to Smith, which aided Smith in formulating a plan to acquire Gearhart. There is no evidence before the Court to support such a claim. After witnessing Mr. Birnie's testimony, the Court is convinced of his personal integrity. Although Mr. Birnie undoubtedly is excessively talkative, the Court is satisfied that he intentionally divulged no confidential information acquired through service on the Gearhart Board of Directors to Smith to aid them in their bid to acquire Gearhart stock. To the contrary, at the October 17, 1983 meeting at which Smith's board authorized a purchase of up to 35% of Gearhart's stock, Mr. Birnie made only a noncommital statement that "a combination of the companies made more sense now than it ever did" and that he "thought both were fine companies." He then left the meeting and did not participate in any discussions or decisions by Smith's board with respect to the acquisition of Gearhart stock. Accordingly, the Court finds no violation of a fiduciary duty by Mr. Birnie owing to his membership on the Board of Directors of both Smith and Gearhart. Nor did Smith indirectly breach a fiduciary duty to Gearhart as a result of Mr. Birnie's actions.

### III. Smith's Preliminary Injunction Application

Smith has counterclaimed and filed a third-party claim under § 14(d) and § 14(e) of the Securities and Exchange Act, 15 U.S.C. § 78n(d) and § 78n(e), and Rules 14d–9 and 14e–2 promulgated by the SEC. Its claims center around the debentures and warrants issued by Gearhart on April 27, 1984. Smith seeks to enjoin the investors who bought said debentures and warrants from disposing of them and from exercising the warrants, among other things. Smith also seeks to enjoin Gearhart from disposing of the proceeds from the sale of the debentures and warrants. Smith claims that the issuance was *ultra vires* and was a breach of a fiduciary duty on the part of Gearhart's directors. Smith also claims that Gearhart did not adequately disclose the terms of the transaction to its stockholders in Gearhart's Schedule 14D–9. The Court will deal first with the issuance itself and then Gearhart's disclosure of its terms.

On April 18, 1984, Gearhart had a board meeting at which representatives from Drexel Burnham discussed with the board some financial options available to Gearhart in light of Smith's April 10, 1984 declaration that it intended to purchase additional shares of Gearhart stock and that it would seek to exert influence on the management of Gearhart. As a result of that meeting, the board passed a number of resolutions. The resolutions authorized the issuance of up to 100,000 units of subordinated debentures having a principal amount of $1,000 each and up to 3,000,000 warrants, each to purchase one share of common stock. The resolution authorized the issuance "upon such terms and conditions (including, without limitation, interest rate, yield rate, and maturity in respect of the Notes and exercise price and expiration date in respect of the Warrants) as the President and Chairman of the Board or any Senior Vice President of the Corporation or any one of them shall determine are in the best interests of the Corporation." The board also authorized the corporation to enter into all agreements and instruments necessary to consummate the transaction. Negotiations with a number of institutional investors were held and conclud-

ed on Tuesday, April 24, 1984. Three days later, after the details of the transaction were worked out and the necessary documentation was prepared, the transaction was completed. This occurred sometime in the morning of April 27, 1984, in California. At approximately noon, Central Time, Smith announced its tender offer. Smith formally made its tender offer on April 30, 1984, in which it detailed the debenture/warrant transaction. On May 3, 1984 the Gearhart board ratified the debenture/warrant transaction.

Put in the simplest terms, Gearhart sold debentures in an aggregate amount of $98,700,000 and warrants to purchase an aggregate of 2,961,000 of newly issued shares of common stock. Gearhart received approximately $73,000,000 from the sale. The debentures bear interest on the outstanding principal at a rate of $8\frac{5}{8}\%$ per annum and mature in ten years. Because they are discounted, the yield to maturity is approximately $14\frac{7}{8}\%$. The warrants are exercisable for a period of five years and carry an exercise price of $33 per share, unless a triggering event occurs, in which case the exercise price is approximately $24.60 per share. A triggering event is a tender offer not recommended by the Gearhart board which would result in the offeror becoming the holder of more than 5,400,000 of Gearhart shares, such as the current tender offer by Smith.

 Texas law imposes on corporate officers and directors a duty to exercise due care in the management of the corporation's affairs. If they breach that duty, they are liable to the corporation for any loss it may suffer as a result of their neglect. *See Sutton v. Reagan & Gee,* 405 S.W.2d 828, 834 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.); *Fagan v. La-Gloria Oil & Gas Co.,* 494 S.W.2d 624, 628 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). Due care is that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances. *Meyers v. Moody,* 693 F.2d 1196, 1209 (5th Cir.1982). Business judgments made by a Texas board of directors are not subject to court review unless they are made in bad faith. *Maher v. Zapata Corp.,* 490 F.Supp. 348 (S.D.Tex.1980). Moreover, corporate directors have the duty to oppose a takeover offer which they have determined would be detrimental to the interests of the corporation and its shareholders. *Panter v. Marshall Field & Co.,* 486 F.Supp. 1168 (N.D.Ill.1980). In fact, having so decided in good faith, with rational business purposes attributable to their decision, directors have not only the right "but the duty to resist by all lawful means persons whose attempt to win control of the corporation, if successful, would harm the corporate enterprise." *Heit v. Baird,* 567 F.2d 1157, 1161 (1st Cir.1977); *Northwest Industries, Inc. v. B.F. Goodrich Co.,* 301 F.Supp. 706, 712 (N.D.Ill. 1969).

Courts have upheld many defensive measures undertaken by directors. *See, e.g., Johnson v. Trueblood,* 629 F.2d 287, 292–93 (3d Cir.1980); *Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757, 759–60 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983) (no breach of fiduciary duty in sale of treasury stock to "white knight"); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 297, 298–99 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (in context of tender offer, "defensive" acquisitions by target upheld); *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380–82 (2d Cir. 1980) (in context of proxy contest, sale of shares to proposed merger partner upheld); *Crouse-Hinds Co. v. InterNorth, Inc.,* 634 F.2d 690, 701–02 (2d Cir.1980) (in context of tender offer, sale of shares to merger partner upheld); *Heit v. Baird,* 567 F.2d 1157, 1161 (1st Cir.1977) (in context of potential control contest, stock issuance upheld); *Northwest Industries, Inc. v. B.F. Goodrich Co.,* 301 F.Supp. 706, 712 (N.D.Ill. 1969) (in context of tender offer, exchange of stock upheld); *Brown Forman Distillers Corp. v. Lenox, Inc.,* 83 Civ. 2116 (D.N.J., June 20, 1983); *Conoco, Inc. v. The Seagram Co., Ltd.,* 517 F.Supp. 1299 (S.D. N.Y.1981); *Pogo Producing Co. v. Northwest Industries, Inc.,* Civil Action No. H–

83–2667 (S.D.Tex. May 24, 1983); *Carter Hawley Hale Stores, Inc. v. The Limited, Inc.*, 587 F.Supp. 246 (C.D.Cal.1984) *temporary restraining order pending appeal denied*, No. 94–7259 (9th Cir. April 18, 1984).

Six of the seven directors on the Gearhart board are outside directors. The evidence shows that all of them possess recognized business acumen. As a group the directors own approximately 7% of the outstanding Gearhart stock. Mr. Anderson of Drexel Burnham testified that he made a thorough presentation to the board on April 18, 1984 which described to the board the mechanics of the proposed debenture/warrant transaction. Although it is clear that at that point the details had not been worked out, the Court finds that the board had adequate information on which to base a decision. Moreover, the board adopted resolutions sufficiently describing the limits of the authorization and later formally ratified the transaction. Furthermore, Tex.Rev.Civ.Stat.Ann. art. 2.14–1 (Vernon's 1980) provides that:

> a corporation may create and issue, whether or not in connection with the issuance and sale of any of its shares or other securities, (1) rights or options entitling the holders thereof to purchase from the corporation any of its shares of any class or classes or other securities ... In the absence of fraud in the transaction, the judgment of the board of directors as to the adequacy of the consideration received for such rights, options, or indebtedness shall be conclusive ...

No fraud is alleged in this case, nor has there been any evidence of fraud. For the foregoing reasons, the Court finds that the issuance of the debentures and warrants was not an *ultra vires* act.

The Court also finds, for the following reasons, that in issuing the debentures and warrants, the directors of Gearhart did not breach their fiduciary duty to the stockholders of Gearhart. (1) Smith has not shown that any of the directors authorized the debenture/warrant transaction in an effort to entrench himself on the Gearhart board; the record shows absolutely no self-interest at play. The fact that Mr. Gearhart has announced that he will not work for a Smith-controlled company does not mean that every action he takes to combat the Smith tender offer bespeaks of entrenchment. (2) The board hired well-respected financial experts and counsel to aid it in preparing for an imminent takeover battle. Drexel Burnham's aim was to keep Gearhart in a credible position to continue business and to put Gearhart in a strong cash position in an effort to maintain flexibility. The advice appears sound and the board decided to follow it. (3) The transaction in question was structured and approved before Smith made its tender offer and may have been complete before Smith announced its intent to make a tender offer. (4) Discount bond offerings are commonplace and allow the issuer to avoid the need to make current cash interest payments. Moreover, Smith's own expert witness, Mr. Goodman, testified that the yield on the debentures was reasonable at the time of the transaction. In a similar, although public, offering involving Occidental Petroleum, completed the day before the Gearhart issuance, a comparable yield rate had been established. (5) The Court also finds credible the testimony stating that the warrants were an integral and necessary part of the transaction. The investors put their faith in Gearhart and only had Gearhart's past record on which to base their investment decision. The warrants help to combat the uncertainty surrounding the fate of their investment and Gearhart. The valuation of the warrants was reasonable as well due to the inherent uncertainty of the situation. Their "springing" nature allows the investors some flexibility and also allows Gearhart to convert debt into equity. (6) Mr. Anderson testified that in arriving at the exercise price of the warrants, his firm sought to eliminate the effects the recent Smith buying and possible tender offer had had on the market price of Gearhart stock. The evidence shows that through most of March, prior to the Smith buying blitz, Gearhart stock traded below the exercise

price of approximately $24.60. Accordingly, the Court finds that the exercise price is reasonable. (7) Both Mr. Gearhart and Mr. Anderson advanced credible business reasons for the issuance, including: (a) retirement of debt that carried an interest rate that varied with the prime rate and on which Gearhart had had problems maintaining covenants; (b) the possible acquisition of an entity Gearhart had been considering; (c) raising necessary capital to produce skids pursuant to a purchase order; and (d) in general to maintain corporate flexibility in a time of uncertainty. The Court finds that the proffered bases for the infusion of capital are reasonable. (8) The fact that one of the reasons for the transaction was an effort to dissuade Smith from pursuing a tender offer does not make the transaction inherently illegal. "Directors of a publicly owned corporation do not act outside of the law when they, in good faith, decide that it is in the best interest of the company and its shareholders that it remain an independent business entity." *Panter v. Marshall Field & Co.*, 486 F.Supp. 1168, 1194 (N.D.Ill.1980), *aff'd*, 646 F.2d 271 (7th Cir.1981). There has been no showing of bad faith on the part of the Gearhart board. The Court finds that it was not unreasonable for the Gearhart board to conclude that a partial tender offer may not benefit all of the shareholders of Gearhart and for the board to take action accordingly. (9) The Court finds without merit Smith's contention that Gearhart could have found other means of raising capital. Specifically, Smith points to Wayne Bank's speech in March 1984 wherein he stated, as financial officer of Gearhart, that Gearhart had no plans to seek any financing at that time. It is obvious that numerous factors could have led Gearhart to reconsider that position. Smith also contended that Gearhart should have drawn on its significant revolving bank credit, rather than issue debentures. As stated earlier in this section, the Court will not question the business judgment of the directors without a showing of bad faith. *Zapata supra.* There has been no showing of bad faith. (10) One other reason to uphold the transaction is that it was negotiated at arm's length with sophisticated businessmen on both sides of the transaction.

For the foregoing reasons, the Court finds that Smith has not demonstrated a substantial likelihood of success on the merits of its claim. The Court further finds that the institutional investors and Gearhart may suffer irreparable harm if a preliminary injunction is issued in favor of Smith and that harm appears to be greater than any Smith will suffer absent an injunction. Furthermore, public policy dictates that the agreement made between Gearhart and the investors not be subject to any further interruption.

The Court finds that Smith's claim that Gearhart did not adequately disclose sufficient facts about the debenture/warrant transaction to its stockholders does have merit. The definition of materiality in this context is the "substantial likelihood that ... disclosure of the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Because none of the documents relating to the debenture/warrant transaction are public, had the Court not enjoined Smith's tender offer in section B(1) above Gearhart would have been required to amend its Schedule 14D–9 to disclose the following information:

(1) the actual yield rate on the debentures of 14⅞%;

(2) the fact that the Smith tender offer is a triggering event; and

(3) the exercise price of the warrants because of the triggering event.

The Court recognizes that Mr. Goodman, Smith's expert from Morgan Stanley, has calculated the true yield on the debentures to be 15.44% and in other ways his calculations differ from those of Drexel Burnham. The *one* thing that Mr. Goodman's testimony made clear is that calculating cashflows and rates of return on debentures and valuing warrants is very complicated business and that experts may disagree on the prop-

228

er factors to consider and the correct formulae to apply. The fact that Mr. Goodman's calculations differ from those of Drexel Burnham does not in any way indicate that Drexel Burnham's calculations are wrong. The Court chooses to accept Drexel Burnham's method of analysis over that of Mr. Goodman.

In summation, the Court finds that:

(1) Gearhart has not shown a substantial likelihood of success on its antitrust claims and thus is not entitled to a preliminary injunction on those grounds;

(2) Gearhart has made the necessary showing entitling it to a preliminary injunction based both on its 13(d) and breach of agreement claims; and

(3) Smith has not shown a substantial likelihood of success on its claims regarding Gearhart's debenture and warrant issue and therefore is not entitled to a preliminary injunction on those grounds. The Court has found that no fiduciary relationship existed between Smith and Gearhart which is entitled to protection under Texas law. Further, the Court concludes that Albert M. Birnie has not divulged confidential information to Smith so as to violate a fiduciary duty owed to Gearhart. The Court further finds that had this Court not enjoined Smith's tender offer, Smith would have been required to make further disclosure regarding the Hughes Tool litigation and, likewise, Gearhart would have been required to disclose to its shareholders more details about its debenture/warrant transaction.