**CONOCO INC., Plaintiff,**

v.

**The SEAGRAM COMPANY LTD., Joseph E. Seagram & Sons, Inc., and Jes Holdings, Inc., Defendants.**

**The SEAGRAM COMPANY LTD., Joseph E. Seagram & Sons, Inc., and Jes Holdings, Inc., Counterclaim Plaintiffs,**

v.

**CONOCO INC., Ralph E. Bailey, Charles A. Anderson, Howard Blauvelt, Theodore F. Brophy, Charles W. Buek, William H. Donaldson, Nancy Hanks, William A. Hewitt, Robert P. Jensen, Dean R. McKay, Michael B. Morris, Frank Pace, Jr., W. Dewey Presley and James E. Robison, Counterclaim Defendants.**

**No. 81 Civ. 4029.**

·United States District Court, S. D. New York.

July 16, 1981.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for plaintiff; Russel H. Beatie, Jr., Michael D. DiGiacomo, Robert C. Myers, Mark Rosenberg, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendants; Roy L. Reardon, Melvyn L. Cantor, Kenneth R. Logan, Stephen E. Banner, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Conoco Inc., seeks a preliminary injunction to enjoin the defendants ("Seagram") from purchasing shares of Conoco based on a tender offer by Seagram set forth in a Schedule 14D–1 dated June 25, 1981 for the purchase of 35,000,000 shares or 40% of Conoco's common stock at $73 per share in cash. Seagram, which asserted a counterclaim against Conoco and its Board of Directors, has requested that the Conoco motion, as well as its cross-motion for a preliminary injunction against Conoco, be consolidated with a trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. However, Conoco objects to a consolidated hearing on the ground that it seeks both equitable and monetary relief, and that as to the latter it has requested a jury trial, which in terms of time and preparation requirements foreclos-

es an immediate consolidated trial. Seagram has advised the Court that it desires its motion for injunctive relief to be deferred *sine die*. Accordingly, only Conoco's motion is before the Court—that is, its motion for preliminary injunctive relief pending a trial on the merits of both Conoco's claim and Seagram's counterclaim. Prior to the hearing of this motion, Conoco attorneys advised the Court that in support thereof it planned to rely solely upon its pleadings, affidavits, depositions of parties and witnesses, and answers to interrogatories; and that it did not intend to call any witnesses.

Since the original motion was presented, additional events have occurred. On July 5, 1981, E. I. du Pont de Nemours & Co. ("Du Pont") made an offer to purchase Conoco shares and Seagram has amended its original offer. The Du Pont offer is based upon an agreement with Conoco whereby Du Pont is to acquire 100% of Conoco stock. It provides for the purchase of 40% of Conoco stock at $87.50 per share and a tax-free exchange of Du Pont shares for the remaining Conoco stock at the rate of 1.6 shares of Du Pont common for each share of Conoco. Du Pont also is given an option to purchase 15.9 million unissued shares of Conoco stock at $87.50 per share. The agreement also provides for the merger of Conoco into a Du Pont subsidiary following the consummation of the offer to purchase.

Subsequently, on July 13, 1981, Seagram amended its original offer by increasing the amount per share to be paid for each share to $85 net to the seller and its tender was increased to 44,350,000 shares, approximately 51% of Conoco's outstanding shares. Conoco's Board of Directors continues to oppose the Seagram tender, even as increased. In supporting the Du Pont proposal as against the Seagram offer, the Board argues that the Du Pont offer is for the acquisition of 100% of the outstanding shares, thus providing for all the stockholders, whereas Seagram seeks only 51% of the Conoco shares. In addition, the Board advances all the contentions previously urged in support of its application for preliminary

injunctive relief with respect to Seagram's initial $73 offer.

In the broadest terms, Conoco contends that Seagram is estopped from making any tender offer to Conoco shareholders for the purchase of their stock by reason of promises made during their negotiations. The claim is based upon the following: Conoco alleges that in late May and early June 1981 while it was resisting a tender offer for the purchase of its shares by Dome Petroleum Ltd. ("Dome"), Seagram, in the course of negotiations with Conoco to acquire Conoco stock, made what it refers to as a "friendly" tender offer for Conoco stock and agreed that if negotiations were unsuccessful that Seagram would "go away" and thereafter not make an "unfriendly" offer;[1] and that the promise was repeated on a number of occasions after the Dome transaction was consummated. Conoco further alleges that prior to and during the period it was engaged in its friendly negotiations with Seagram, Conoco was also engaged in negotiations with the Cities Service Company ("Cities Service") with respect to a tax-free merger whereby Conoco would acquire all of the outstanding shares of Cities Service. Conoco further alleges that on June 17, 1981, its Board of Directors decided to reject the Seagram proposal and that in doing so the Board acted in reliance upon the Seagram promise that it would not make a hostile tender offer for Conoco common stock; that thereafter on June 25, 1981, the Boards of Directors of Conoco and Cities Service approved in principle an agreement for the merger of the two companies; that later that day, Seagram, contrary to its previous promises, made an "unfriendly" tender offer for as much as 40% of the Conoco common stock at $73 per share; and that in consequence, Cities Service terminated the merger negotiations and thereby the Conoco shareholders lost the financial benefit of a merger with Cities Service and

the Conoco Board lost the opportunity to obtain from Seagram a standstill agreement which would remain in effect for 15 years, including an agreement: not to buy more than 25% of Conoco stock; to vote for Seagram stock in the election of Directors in the same proportion as the stock voted by all other shareholders; not to solicit proxies in opposition to any recommendation by Conoco's Board; and to dispose of its shares only in specified transactions intended to produce broad distribution and other advantageous restrictive covenants. As to the latter, Conoco asserts a separate claim and the relief requested is that if the tender offer is permitted to proceed, Seagram be required to hold any acquired stock subject to the standstill restrictions offered during their negotiations.

Seagram, in opposing plaintiff's motion for a preliminary injunction, among other matters, raises several significant fact issues. It asserts that on May 6, 1981, Dome made a tender offer for 20% of Conoco's outstanding shares for the purpose of exchanging them for Conoco's majority stock interest in Hudson's Bay Oil & Gas Company Limited ("HBOG"), a Canadian corporation. The Dome offer also was considered by Conoco as hostile and it was, as Conoco admits, vigorously opposed by it. Despite Conoco's opposition, Dome's offer was oversubscribed and resulted in the tender of more than 50% of Conoco's outstanding stock. Thereafter Dome and Conoco negotiated the price to be paid for Conoco's HBOG stock and reached an agreement whereby Dome agreed to pay 22 million shares of Conoco stock and $245,000,000 in cash.

Seagram, at or about the time Dome acquired its Conoco stock, considered the advisability of purchasing available Conoco shares as an investment and decided to

---

1. Upon the argument of the motion, in response to the Court's inquiry, Conoco's counsel stated: "[A] friendly offer is supported by management and the Board of Directors of the target company. An unfriendly offer is not." Hearing Tr. at 6. Defense counsel did not agree with this definition. His view was that the stockholders' rights were the central factor: "What is good for the shareholders ought to decide whether it is friendly or unfriendly, not what the directors or management of the target company suggests might be an appropriate definition of hostility or unfriendliness or what have you." Hearing Tr. at 58–59.

make a direct approach to Conoco's management in furtherance of this investment interest, which at that time Conoco welcomed in the light of its unsuccessful resistance to the unwelcome Dome tender. Seagram stock ownership was considered a means of defeating Dome's attempt to force divestiture of the HBOG stock at less than an adequate price for the controlling bloc. The Seagram Board authorized a proposal to Conoco's management of a tender by Seagram to acquire 35% of Conoco stock at $75 a share under a "standstill agreement" that would restrict, as referred to above, its rights to the acquired stock. Seagram does not dispute that at the outset of their discussions centering about the Dome situation it promised friendly negotiations, but denies that these expressions, repeated when the parties continued their negotiations after the Dome transaction was concluded, viewed in the proper context of events, committed Seagram to an irrevocable promise not to make a tender offer without Conoco's consent in the event their negotiations failed.

Additionally, Seagram contends that during and prior to its negotiations with Conoco with respect to its proposed investment, Conoco had been in negotiation with Cities Service with respect to a merger of the companies; that during the entire period of its negotiations with Conoco, the Cities Service merger negotiations were never mentioned nor was Seagram ever apprised by Conoco as to the likelihood of a merger transaction with anyone; that Seagram was led to believe that Conoco was considering an acquisition in the field of "renewable resources," and that such an acquisition, even if made, would not stand in the way of the proposed Seagram investment; and that its offer and the standstill proposal were made in reliance upon Conoco's good faith in the negotiations with respect to the proposed investment. Seagram emphasizes that the alleged concealment by Conoco of the Cities Service negotiation was of material significance since it was

concerned that its contemplated investment in Conoco not be diluted, a subject it asserts was discussed with Conoco. Seagram further asserts that although it was kept in the dark, Conoco did apprise Cities Service of its negotiations with Seagram. However phrased, but bluntly stated, Conoco is here charged with duplicity and bad faith in its dealings with Seagram, and that any promise by Seagram not to make an unfriendly offer in the event their negotiations failed is vitiated by Conoco's conduct which forecloses any equitable relief since it comes into court with "unclean hands."

Conoco disputes the charge and asserts that while it did not specifically identify Cities Service by name during its negotiations with Seagram, it was made clear and Seagram knew that Conoco was considering a major transaction under its diversification program. Moreover, Conoco contends it was under no obligation, legal or moral, to disclose to Seagram that it was in negotiation with Cities Service for a merger.

■ Against the broad outline of the parties' contentions we consider plaintiff's motion for a preliminary injunction to enjoin Seagram's tender offer. Under the rule in this Circuit, Conoco, to prevail on its motion for a preliminary injunction, must establish irreparable injury and either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in its favor.[2] The initial burden that Conoco must sustain is a showing of irreparable injury. It claims that Seagram deprived it of the opportunity to consummate the merger transaction with Cities Service to its detriment by reason of Seagram's failure to adhere to its promise not to make an unfriendly offer. However, the fact is that when Cities Service withdrew its merger proposal, whether because of the Seagram offer or, as Seagram contends, for other reasons, Conoco soon thereafter entered

---

2. *Union Carbide Agric. Prods. Co. v. Costle*, 632 F.2d 1014, 1017 (2d Cir. 1981); *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979); *Seaboard World Airlines, Inc. v. Tiger Int'l, Inc.*, 600 F.2d 355, 359 (2d Cir. 1979).

into the Du Pont agreement. Conoco does not dispute that the Du Pont proposal, still outstanding, is more favorable than the prior proposed Cities Service merger. In addition, however one may evaluate the amended Seagram offer of $85 per share as against the per share value under the Du Pont offer,[3] this, too, appears to be a better offer than the Cities Service proposal. Under these circumstances, any claim of irreparable injury to Conoco by reason of the non-consummation of the Cities Service proposal is without substance.

Conoco, however, presses that it still faces irreparable injury in the face of the most recent Seagram offer.[4] The argument advanced upon the hearing of this motion was that if not enjoined by an injunction, enough shareholders may accept the Seagram offer which would foreclose the availability of a minimum 51% of the outstanding shares of Conoco stock which is a condition of the Du Pont tender offer. This is simply another way of the Directors of Conoco pressing their view that the Du Pont proposal in their judgment is more favorable to the stockholders than the Seagram offer and renewing their previously stated hostility to that offer. To be sure, the Board of Directors are under a duty to exercise their best business judgment with respect to any proposal pertaining to corporate affairs, including tender offers. They may be right; they may know what is best for the corporation, but their judgment is not conclusive upon the shareholders. What is sometimes lost sight of in these tender offer controversies is that the shareholders, not the directors, have the right of franchise with respect to the shares owned by them; "stockholders, once informed of the facts, have a right to make their own decisions in matters pertaining to their economic self-interest, whether consonant with or contrary to the advice of others, whether such advice is tendered by management or outsiders or those motivated by self-interest."[5] In this instance, the shareholders now have the choice of acting upon the existing outstanding offers of Du Pont and Seagram. The Directors, however, by this application to restrain the Seagram offer, seek to limit the stockholders to a single choice—the Du Pont offer. The decision whether to accept one or the other, or even to reject both, rests with the stockholders and not the Board. Seagram was free to make an offer to Conoco's shareholders except for the contention of the Conoco Board that Seagram forfeited its right to make the tender offer. The estoppel claim, based upon promises made by Seagram to Conoco's Directors during the course of negotiations, should not deprive the stockholders of an opportunity to exercise their individual judgments to accept or reject the Seagram offer, particularly since Seagram disputes the viability of the promise in the light of its charges of duplicity by Conoco. The Directors are free to continue by proper legal means to express to the shareholders their objection and hostility to the Seagram proposal, but they are not free to deny them their right to pass upon this offer or any other offer for the purchase of their shares.

What this Court said in a somewhat similar situation a number of years ago in *Armour & Co. v. General Host Corporation*,[6] is relevant: "[T]he equities of the situation speak against an injunction. Indeed, they

---

**3.** Since the argument of this motion and during the course of the preparation of this opinion, the Court has been informed that Du Pont has increased its original offer. Its current offer is to pay Conoco shareholders $95 a share for 40% of the outstanding common stock and an exchange of 1.7 of Du Pont shares for each of the balance of Conoco shares. This offer, too, has the unanimous approval of the Conoco Board.

**4.** Although Conoco has received an admittedly better offer from Du Pont, it is not without interest to note its position prior thereto: "If

Seagram's tender offer is enjoined it may still be possible for Conoco to arrange a more favorable transaction with a third party, which could minimize (if not eliminate entirely) the damages for Seagram's tortious interference." Memorandum In Support of Plaintiff's Motion for a Preliminary Injunction at 29.

**5.** *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, 276 F.Supp. 45, 50 (S.D.N.Y. 1967).

**6.** 296 F.Supp. 470 (S.D.N.Y.1969).

require that stockholders not be deprived of the opportunity to accept the cash offer of Greyhound or the exchange offer of General Host, or to reject both. The stockholders are entitled to exercise their own judgment as to these matters.... The decision whether to buy, exchange, or do neither should rest with each individual stockholder." [7] So, too, in this case the equities dictate that the decision to accept one offer or the other should rest with the shareholders and that the judgment of the Directors, no matter how adverse to the Seagram offer and favorable to the Du Pont offer, should not deprive them of that opportunity. It should be emphasized that this is not a case where the offeror is charged with failure to disclose material facts in violation of securities acts.[8] Here, the shareholders have all the material facts necessary to make their investment decision. Thus there is no need, as there is in cases where securities acts' violations are charged, for a preliminary injunction pending a determination of disputed issues as to the alleged violations.

Counsel for Conoco, upon argument of this motion, urged that in this frenetic period of billion dollar tender offers, "when there are takeovers and tender offers galore," [9] which bring in their wake great stock market activity in the shares of the involved corporations, there is need to protect the long-term investment shareholder and the "widows and orphans" who derive income from their holdings against the predatory speculators in the stock.[10] If there are such evils in a free-trading stock market, the correction rests with the Congress and not with the judiciary. Indeed, whenever situations have developed which required that the investing public be protected, Congress has enacted legislation to afford protection.[11] Under all the circumstances, Conoco has failed to establish irreparable injury.

This application also fails because Conoco has not established likelihood of success on the merits. While the Court makes no determination upon the merits, which must await a full trial, the issue of Conoco's good faith in its dealings with Seagram during the negotiations with Cities Service and other issues presage a sharp factual controversy where the demeanor of witnesses may significantly resolve the ultimate fact issue. With respect to this application, plaintiff failed to present the testimony of any witness but relied upon affidavits and excerpts from depositions of witnesses whose versions of events were in conflict. The contradictory evidence on matters of substance militates at this time against a finding of likelihood of success. So, too, while it may be acknowledged that there are sufficiently serious claims going to the merits to make them fair ground for litigation, Conoco has failed to establish that a balance of hardship tips decidedly in its favor. On the contrary, if anything, the balance of hardship tips in favor of the shareholders who, with knowledge of all material facts, should not be deprived of the opportunity to make their own investment decision as to the Seagram amended offer as against the Du Pont offer or any other that may be presented to them.

The motion for a preliminary injunction is denied. So ordered.

---

7. *Id.* at 475 (citing *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, 276 F.Supp. 45, 50 (S.D.N.Y.1967)).

8. Plaintiff itself has emphasized this: "In typical tender offer suits, the target company claims that the offeror has failed to disclose or has inadequately disclosed material facts, and it quibbles over the wording and punctuation of the Offer to Purchase sent to the shareholders. Not so here." Memorandum In Support of Plaintiff's Motion for a Preliminary Injunction at 2.

9. *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283, 1284 (2d Cir. 1976), *rev'd*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

10. Hearing Tr. at 17–19, 82–83.

11. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 26–30, 97 S.Ct. 926, 941–943, 51 L.Ed.2d 124 (1977); *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.*, 425 F.Supp. 1145, 1152 (S.D.N.Y.1977).