**A. COPELAND ENTERPRISES, INC., et al., Plaintiffs,**

**v.**

**William J. GUSTE, et al., Defendants.**

**Dixie J. O'NEILL, Plaintiff,**

**v.**

**CHURCH'S FRIED CHICKEN, INC., et al., Defendants.**

Civ. A. Nos. SA–88–CA–1385, SA–88–CA–1238.

United States District Court, W.D. Texas, San Antonio Division.

Feb. 24, 1989.

**65.** *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968).

Frederick C. Shannon, Jr., Barbara Nellermoe, Shannon & Weidenbach, Inc., San Antonio, Tex., Richard H. Caldwell, Mayor, Day & Caldwell, Houston, Tex., Samuel Kadet, Constance S. Huttner, Skadden, Arps, Slate, Meagher & Flom, New York City, for A. Copeland Enterprises, Inc. and Biscuit Investments, Inc.

Alan Michael Ferrill, Keith E. Kaiser, Cox & Smith, Inc., San Antonio, Tex., K. Ann McDonald, Dennis E. Glazer, Davis, Polk & Wardwell, New York City, for Church's Fried Chicken, Inc.

Robert J. Myers, Willis, Hickey & Houghan, San Antonio, Tex., C. Timothy Smoot, Law Offices of Frederic Brace, Chicago, Ill., for Dixie J. O'Neill.

K. Ann McDonald, Davis, Polk & Wardwell, New York City, for Church's Fried Chicken, Inc., et al.

#### AMENDED ORDER

PRADO, District Judge.

On this date came on to be considered Plaintiff Biscuit Investments, Inc.'s Application for Preliminary Injunction, filed in Civil Action No. SA–88–CA–1385 on December 19, 1988; and Plaintiff Dixie J. O'Neill's Motion for Preliminary Injunction, filed in Civil Action No. SA–88–CA–1238 on December 28, 1988. Civil Action Nos. SA–88–CA–1385 and SA–88–CA–1238 were consolidated by the Court for purposes of deciding whether a preliminary injunction should issue in either or both cases. The Court shall deal with both preliminary injunction requests in this order.

Movants are Plaintiff Biscuit Investments, Inc. ("Biscuit"), one of the entities which commenced the tender offer at issue in these cases, and Plaintiff Dixie J. O'Neill, an individual owning 2,500 shares of Church's Fried Chicken, Inc.'s ("Church's") common stock. Movants seek a preliminary injunction enjoining Defendants Church's and the members of its board of directors (the "Director Defendants") from implementing or enforcing and compelling them to redeem the shareholder rights plan, or "poison pill," issued by Church's on November 4, 1988.[1]

### I. BACKGROUND

A. Copeland Enterprises, Inc. ("Copeland"), one of the plaintiffs in these cases, is a Louisiana corporation engaged principally in selling fried chicken and complementary food items through company-owned and franchised "Popeyes Fried Chicken & Biscuit" restaurants. Biscuit is a wholly owned subsidiary of Copeland and is also organized under Louisiana law. Biscuit beneficially owns approximately 3.2% of the outstanding common shares of Church's, all of which were acquired prior to October 25, 1988.

Church's is a Texas corporation with its principal place of business in San Antonio, Texas. Church's is also engaged in selling fried chicken and complementary food items through company-owned and franchised stores. Church's has approximately 36 million shares of common stock out-

---

1. O'Neill also seeks disclosure to Church's shareholders of assumptions made by the Director Defendants and Church's management relating to the new "business plan" for Church's and waiver of certain standstill provisions contained in confidentiality agreements entered into by representatives of Church's and other potential purchasers of Church's. The Court will consider these issues in a separate order to follow.

standing, which shares are traded publicly over the New York Stock Exchange.

Church's financial condition and operating results have declined dramatically in the past several years. Church's net earnings have fallen from approximately $42.6 million in 1984 to approximately $9.3 million in 1987 and to a projected loss of $15.6 million for 1988. Church's earnings per share have also declined during this period, from $1.13 in 1984, to $0.26 in 1987, and to a projected loss of $0.40 for 1988. In the fourth quarter of 1988, Church's discontinued the payment of dividends on its common stock indefinitely.

Director Defendants Ernest Renaud, J. David Bamberger, Sangwoo Ahn, Robert Hilgenfeld, Ricardo Longoria, Alex H. Halff, Kaye C. Edwards, and Ernest Green are the eight members of Church's board of directors. Each of the Director Defendants receives from Church's an annual fee of $20,000, a $50,000 life insurance policy, and other benefits. The Director Defendants have also granted themselves options to purchase 25,000 shares of Church's stock at $6.07 per share.

Defendant Bamberger has been Church's Chairman of the Board from 1983 through the present time. Bamberger now receives an annual salary of $100,000.

Defendant Renaud is the only inside director of Church's. He has been Church's President since June 1988 and receives an annual salary of $250,000. In addition, in November 1988, Renaud received a cash bonus of $125,000 and a "golden parachute" severance agreement [2] worth more than $500,000.

Defendant Ahn, a Church's director since 1972, is a partner in the investment banking firm of Morgan, Lewis, Githens & Ahn ("Morgan Lewis"), Church's longtime financial adviser. As a Morgan Lewis partner, Mr. Ahn has shared in the investment banking fees that Morgan Lewis has received from Church's.

Defendant Longoria, a Church's director since 1983, is a principal shareholder and a director of a Mexican corporation which holds a franchise from Church's for fried chicken stores in Mexico.

■ On October 25, 1988, Biscuit and Copeland commenced an $8 per share cash tender offer for all of the outstanding shares of Church's common stock. The tender offer is currently set to expire on February 19, 1989. Following the conclusion of the tender offer, Biscuit and Copeland intend to effect a "second-step" merger with Church's, pursuant to which Biscuit and Copeland will acquire any Church's shares not acquired in the tender offer for the same $8 cash per share.[3]

At a board meeting held on November 4, 1988, the Director Defendants voted to recommend that Church's shareholders reject the tender offer. The Director Defendants based this decision primarily on the opinions of Church's financial advisers Morgan Lewis and Morgan Stanley & Co., Inc. ("Morgan Stanley") that the $8 tender of-

---

**2.** "In the takeover context 'golden parachutes' generally are understood to be termination agreements providing substantial bonuses and other benefits for managers and certain directors upon a change in control of a company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 178 n. 5 (Del.1986).

**3.** Because Biscuit's tender offer treats shareholders who sell their shares in the second step the same as shareholders who tender during the first step, the offer is not coercive.

A coercive tender offer is a bid in which the structure of the offer, rather than its effect on shareholder wealth, induces shareholders to tender their shares. The paradigm is the two-tiered bid in which the first tier pays cash and the second tier consists of junk bonds (heavily subordinated debt securities). This type of bid creates a prisoner's dilemma in which shareholders may tender their shares not because they perceive it as a wealth increasing transaction, but because they fear that if they do not tender they will "be left with low value [junk bonds]." In response to a coercive bid, directors could adopt a shareholder rights plan that would guarantee shareholders roughly equivalent value for their shares in the second tier.

Note, *False Halo: The Business Judgment Rule in Corporate Control Contests,* 66 Tex.L.R. 843, 857 n. 77 (citations omitted). The shareholder rights plan adopted by the Defendant Directors in this case was not adopted to protect shareholders selling their shares in the second tier since Biscuit's tender offer treats all shareholders, in both the first and second tiers, equally.

fer price was inadequate[4] and their own belief that Church's shareholders would realize higher values for their shares in the future as a result of either an alternative transaction or Church's new business plan to be implemented by Defendant Renaud.

At the November 4 meeting, the Director Defendants also approved golden parachute severance agreements for 16 senior executives at Church's. These contracts, which are exercisable under certain circumstances upon a change in control of Church's, provide for lump sum payments to the covered executives totalling $2 million. The funds for these payments will come from Church's corporate treasury.

The Director Defendants also adopted a shareholder rights plan or "poison pill."[5] The Director Defendants advised Church's shareholders that the poison pill was adopted "in order to protect ... shareholders from the inadequate conditional offer [of Biscuit and Copeland] and permit management ... sufficient time to determine whether a sale of the company is in the best interest of the stockholders and to explore additional options...." Plaintiffs' Exhibit 1, at 6.

Pursuant to the poison pill adopted by the Defendant Directors, one "right" for each outstanding share of common stock was distributed to each of Church's shareholders of record on November 4, 1988. These rights can be redeemed by the Director Defendants for the nominal price of $0.01 per right at any time before an entity not approved by Church's Board of Directors "triggers" the poison pill by purchasing 30%[6] or more of Church's stock or by engaging in certain other transactions. The poison pill contains "flip-in" and "flip-over" provisions which, if triggered, would immediately and severely dilute the investment of the triggeror.[7]

---

**4.** "An inadequate bid occurs when the intrinsic value of the corporation's assets exceeds the tender offer price, increasing the chances that someone else could make a better offer. The inadequate bid problem results from shareholders' inability to coordinate their actions to maximize their bargaining power and from the short decision period for tender offers." Note, *supra* footnote 3, at 857 n. 77.

While the Court has attempted in this order to avoid judging the business judgment of Church's and its directors, the Court notes that Morgan Stanley's fee for its services will increase if Church's receives an offer of $9 per share or more. At least one court has viewed a similar fee arrangement with suspicion. *Dynamics Corp. of America v. CTS Corp.*, 805 F.2d 705, 710–11 (7th Cir.1986) (Posner, J.), *rev'd on other grounds*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

**5.** "A poison pill is a plan under which present shareholders get the right to be bought out or receive additional shares of common stock at bargain prices upon the occurrence of a triggering event." Note, *supra* footnote 3, at 858 n. 80.

**6.** Church's has offered no explanation for how it determined the threshold levels triggering the poison pill. In *Dynamics Corp. of America v. CTS Corp.*, Judge Posner speaking for the panel commented on the effect of such thresholds:

Despite much talk of "blocking positions," the record contains no evidence as to how Dynamics could use 28 percent or any other fractional ownership short of 50 percent to block anything.... Dynamics can no more block majority decisions with 49.99 percent of the company than with 27.5 percent. If some-

one tenders for more than 50 percent of the shares (however slightly more), and succeeds in the tender, he can if he wants squeeze out Dynamics and become sole owner of CTS.... Poison pills with lower triggering percentages [than 28 percent] have been upheld. But every poison pill is *sui generis*, and there must be evidence justifying setting the triggering percentage below the level that would give a minority shareholder an actual legal right to block decisions taken by the majority.

*Dynamics Corp. of America v. CTS Corp.*, 805 F.2d 705, 712 (7th Cir.1986), *rev'd on other grounds*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *see also* Helman & Junewicz, *A Fresh Look at Poison Pills*, 42 Bus.Law. 771, 783–85 (1987) (comparing the approaches of various courts to this issue).

**7.** The flip-in provision provides that, if an entity reaches a threshold shareholding of 30% of Church's outstanding common shares, each right holder will be entitled to purchase from Church's that number of shares per right as, at the triggering time, have a market value of twice the exercise price of each right. In other words, each right holder can buy $40 worth of Church's stock for $20 after a triggering event takes place. The flip-over provision provides that, in the event of a merger of Church's or the acquisition of 50% or more of Church's assets or earning power, each right holder may exercise his right and acquire common stock of the acquiring company having a value of twice the exercise price of each right. In other words, for each right held, the right holder can purchased $40 worth of the acquiring company's stock for $20.

Because they believe the poison pill constitutes a substantial economic barrier to the consummation of their tender offer, Biscuit and Copeland have conditioned the tender offer on the redemption or invalidation of the poison pill.

On January 18, 1989, nearly 3½ months after the tender offer was commenced, Church's announced publicly that the Director Defendants had determined that a sale of the company would be in the best interests of the shareholders. To this end, Church's announced that it would conduct an "auction" of the company over the next 30 days, ending on February 18, 1989, one day prior to the date on which the tender offer will expire.

## II. APPLICABLE LAW

The parties appear to be in agreement and the Court finds that, because Church's is a Texas corporation and the adoption of the poison pill occurred in Texas, Texas law applies to these cases. *State of California v. Copus*, 158 Tex. 196, 309 S.W.2d 227, 230, *cert. denied*, 356 U.S. 967, 78 S.Ct. 1006, 2 L.Ed.2d 1074 (1958) ("questions of substantive law are controlled by the laws of the state where the cause of action arose"); *Morris v. LTV Corp.*, 725 F.2d 1024, 1027 (5th Cir.1984); *see Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707 (5th Cir.1984) (Texas law applied to determination of validity of Texas corpora-

tion's directors' adoption of anti-takeover measure).

## III. STANDING

### A. Biscuit

■■■ At the time it commenced its tender offer and this suit, Biscuit was the beneficial owner of approximately 3.2% of Church's outstanding common shares. Biscuit thus may advance its claims against the Defendant Directors in a shareholder's derivative suit. *Gearhart*, 741 F.2d at 721. Claims concerning breach of a corporate director's fiduciary duties can only be brought by a shareholder in a derivative suit because a director's duties run to the corporation, not to the shareholder in his own right. *Id.* (citing, *e.g., United States v. Palmer*, 578 F.2d 144, 145–46 (5th Cir. 1978) (per curiam)). An examination of Biscuit's Verified First Amended and Supplemental Complaint for Declaratory and Injunctive Relief, filed in Civil Action No. SA–88–CA–1385 on December 16, 1988,[8] reveals that Biscuit has complied with the requirements of Texas Business Corporation Act article 5.14 B [9] and Federal Rule of Civil Procedure 23.1 for bringing a derivative suit on behalf of Church's. It thus appears that Biscuit has standing to bring this action.

### B. O'Neill

O'Neill brings her action individually as a proposed class representative of Church's shareholders and derivatively against the

---

**8.** On December 13, 1988, the Honorable Charles Schwartz, Jr., United States District Judge for the Eastern District of Louisiana, entered his order severing the claims of Biscuit and Copeland regarding the poison pill from the claims originally brought before him by Biscuit, Copeland, and Plaintiffs Lewis B. Kilbourne and George Samaras. This order was made pursuant to Judge Schwartz's power to transfer cases under 42 U.S.C. § 1404(a) and was based on his implicit decision that the poison pill claims were severable under Federal Rule of Civil Procedure 42(b) from the other claims brought by Biscuit, Copeland, Kilbourne and Samaras. Judge Schwartz apparently did not think his action was inconsistent with this Court's previous decision dismissing *Church's* request for a declaration that its poison pill was *valid* based on this Court's conclusion that the request was a compulsory counterclaim under Federal Rule of Civil Procedure 13(a) that should have been

brought in the case already pending before Judge Schwartz. *Church's Fried Chicken, Inc. et al. v. A. Copeland Enterprises, Inc., et al.*, Civil Action No. SA–88–CA–1221 (W.D.Tex. Nov. 17, 1988).

**9.** A derivative suit may be brought in [Texas] only if:

(1) The plaintiff was a record or beneficial owner of shares ... at the time of the transaction of which he complains, ... and

(2) The initial pleading in the suit states:

(a) The ownership required by subsection (1), and

(b) With particularity, the efforts of the plaintiff to have suit brought for the corporation by the board of directors, or the reasons for not making such efforts.

Tex.Bus.Corp.Act Ann. art. 5.14 B (Vernon 1980).

Defendant Directors for alleged breach of their fiduciary duties to Church's. An examination of O'Neill's Complaint, filed in Civil Action No. SA–88–CA–1238 on November 10, 1988, reveals that, under Federal Rule of Civil Procedure 23, O'Neill is potentially a proper class representative.[10] Further, she has met the prerequisites of Texas Business Corporation Act article 5.14 B and Federal Rule of Civil Procedure 23.1 for bringing a derivative suit on behalf of Church's. O'Neill thus has standing to maintain her suit.

## IV. PRELIMINARY INJUNCTION STANDARD

Four requirements must be met by a movant in order to obtain the relief afforded by a preliminary injunction. It must be shown that:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir.1987). The decision to grant or deny a preliminary injunction lies within the discretion of the Court, and that discretion must be exercised in light of the four requirements set out above. *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).

10. The Court has not yet certified O'Neill's case as a class action and may not do so due to the previous certification in state court of a class virtually identical to that proposed by O'Neill. *Robert J. Piro, et al. v. J. David Bamberger, et al.*, No. 88–CI–19608 285th Judicial District Court (Bexar County, Texas). It is not necessary, however, for the Court to decide whether O'Neill's case should proceed as a class action to determine her preliminary injunction request.

11. Delaware was the first jurisdiction to specifically address the standards to be applied in ruling on the validity of poison pills. *Moran v. Household Int'l*, 500 A.2d 1346 (Del.1985) (upholding a poison pill). The development of these standards has continued primarily under Delaware law. *See, e.g., Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173

## V. THE MERITS

The Court will first examine the likelihood that Biscuit and O'Neill will prevail on the merits in these cases.

### A. Applicable Texas Law

In the context of determining the validity of an anti-takeover defense adopted in response to a hostile tender offer, the fiduciary duties of corporate directors under Texas law were first examined by the Fifth Circuit Court of Appeals in *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707 (1984). Since *Gearhart*, a number of courts have been confronted with the issue raised in this case; namely, whether the adoption of an anti-takeover defense, specifically a poison pill, in response to a hostile tender offer constitutes a breach of a corporate director's fiduciary duties.[11] Despite the recent litigation regarding poison pills and other takeover defenses, the Court is of the opinion that *Gearhart* states the law to be applied in this case. Although no decision of the Texas state courts has directly addressed the issue of corporate directors' fiduciary duties in response to tender offers;[12] *Gearhart* applies Texas law in determining the validity of a target's resistance to a hostile tender offer through the issuance of debentures and warrants. Differing facts aside, such takeover resistance is the substance of the issue before this Court. *Gearhart*'s discussion of Texas law can easily be applied in the context of a poison pill. Indeed,

(Del.1986); *Grand Metro. Pub. Ltd. Co. v. Pillsbury Co.*, Civil Action No. 10319 (Del.Ch. Dec. 16, 1988) [1988 WL 144830]; *Desert Partners, L.P. v. USG Corp.*, 686 F.Supp. 1289 (N.D.Ill. 1988) (applying Delaware law); *Southdown, Inc. v. Moore McCormack Resources, Inc.*, 686 F.Supp. 595 (S.D.Tex.1988) (same); *CTRF Corp. v. Federated Dept. Stores, Inc.*, 683 F.Supp. 422 (S.D.N.Y.1988) (same).

12. The closest a Texas state court has come to addressing this issue is *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768 (Tex.Civ.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988), in which the Texas Court of Appeals applied Delaware law regarding the fiduciary obligations of corporate directors in the face of a tender offer. *Id.* at 808–09.

*Moran v. Household Int'l*, the first poison pill case, cited *Gearhart* approvingly. 500 A.2d 1346, 1350 (Del.1985). Accordingly, the Court will apply the law as set out in *Gearhart* in making its decision.[13]

### B. Corporate Directors' Duties

■ Texas law holds that corporate directors are fiduciaries owing three "broad duties" to their corporation—the duties of obedience,[14] due care,[15] and loyalty. *Gearhart*, 741 F.2d at 719. In support of their preliminary injunction requests, Biscuit and O'Neill contend that the Defendant Directors breached their duty of loyalty to Church's in adopting and maintaining in effect the poison pill.[16]

■ "The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation." *Id.* To prove a breach of this duty, it must be shown that the director was "interested" in a particular transaction. A director is interested if he:

> (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity, (2) buys or sells assets of the corporation, (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated, or (4) transacts business in his director's capacity with a family member.

*Id.* at 719–20 (citations omitted).

Another means of showing interest, when a threat of takeover is pending, is to

---

**13.** The Court was assisted in making its decision by the discussions contained in the following articles: Note, *False Halo: The Business Judgment Rule in Corporate Control Contests*, 66 Tex.L.R. 843 (1988); Simpson, *The Emerging Role of the Special Committee—Ensuring Business Judgment Rule Protection in the Context of Management Leveraged Buyouts and Other Corporate Transactions Involving Conflicts of Interest*, 43 Bus.Law. 665 (1988); Helman & Junewicz, *A Fresh Look at Poison Pills*, 42 Bus.Law. 771 (1987); Dawson, Pence & Stone, *Poison Pill Defensive Measures*, 42 Bus.Law. 423 (1987).

**14.** The duty of obedience requires a director to avoid committing ultra vires acts. *Gearhart*, 741 F.2d at 719. No party has alleged that such acts occurred in these cases. In fact, the adoption of the poison pill appears to be consistent with Texas Business Corporation Act article 2.14–1 which allows a corporation to issue stock rights, options, and convertible indebtedness.

**15.** The Delaware courts have concentrated on the duty of care in analyzing the propriety of corporate directors' actions in the face of takeover threats. The seminal case setting forth the "enhanced" standard to be applied in evaluating such situations is *Unocal v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985). In *Unocal*, the Delaware Supreme Court noted that the duty of care "extends to protecting the corporation and its owners from perceived harm whether a threat originates from third parties of other shareholders." *Id.* at 955. The court indicated, however, that when a board addresses a takeover bid, there is an "omnipresent specter that a board may be acting primarily in its own interests...." *Id.* at 954. In these situations, the board's duty is enhanced such that "judicial examination [must occur] at the threshold before the protections of the business judgment rule may be conferred." *Id.* Specifically, a

court must decide (1) whether the directors acted solely or primarily out of a desire to perpetuate themselves in office, and (2) whether the defensive measure adopted was reasonable in relation to the threat posed. *Id.* at 955. If these two prongs are successfully met by the directors, the business judgment rule may be applied to protect their actions. *Id.*

In Texas, " '[t]he modern view definitely stresses the duty of loyalty and avoids specific discussion of the parameters of due care.' " *Gearhart*, 741 F.2d at 720–21 (quoting Ubelaker, *Director Liability Under the Business Judgment Rule*, 35 Sw.L.J. 775, 789 (1981)). Hence, the parties and this Court have concentrated on the duty of loyalty, as did the *Gearhart* panel. Texas courts hold that the business judgment rule is a defense to actions for breach of the duty of care. *Id.* at 721. The rule is not implicated in actions for breach of the duty of loyalty.

**16.** In her brief filed prior to the preliminary injunction hearing, O'Neill also raised the argument that the Defendant Directors had breached their duty of care to Church's. Plaintiff O'Neill's Brief in Support of Motion for a Preliminary Injunction, Jan. 17, 1989, at 16. O'Neill did not, however, separate this argument from her contentions regarding the alleged breach of the duty of loyalty and did not make any argument regarding breach of the duty of care in her post-hearing brief. *See* Plaintiff O'Neill's Post–Hearing Brief in Support of Motion for a Preliminary Injunction, Feb. 2, 1989. Because it appears that O'Neill is no longer arguing that the Defendant Directors breached their duty of care and because the Court believes a decision regarding an alleged breach of the duty of care is unnecessary, the Court shall not address the Defendant Directors' possible breach of their duty of care.

demonstrate that actions were taken with the goal of director entrenchment. In *Gearhart*, the wouldbe acquirer argued that the directors of the target company adopted the anti-takeover defense at issue "solely to entrench themselves on the board, thus making them interested directors." *Id.* at 722. The *Gearhart* panel assumed that the tender offeror had made a prima facie showing of interest, and shifted the burden to the target corporation's directors to prove the fairness of their actions. *Id.* While the Fifth Circuit did not find the directors to be interested on the facts before it,[17] the court clearly indicated that interest could be shown by an attempt at self-entrenchment.

A finding that interest is demonstrated by attempts at self-entrenchment is in accordance with both the modern law of poison pills and well-settled principles of Texas corporate law. Texas courts have long held corporate directors and officers to rigorous fiduciary standards. As was stated in *Milam v. Cooper Co.*, 258 S.W.2d 953 (Tex.Civ.App.—Waco 1953, writ ref'd n.r. e.),

> A director or other corporation officer will not be permitted to derive any personal profit or advantage by reason of his position, distinct from his coshareholders, and the law has ceased to look at the mere form of the device employed, but instead now pierces through the surface and seizes upon the evils that lie within.
>
> An officer of a corporation is obligated by reason of his mere occupancy of the office, to act in all matters affecting the corporation and its stock holders solely with an eye to their best interest, unhampered by any pecuniary interest of his own.

*Id.* at 956 (citations omitted); *see also International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex.1963) (di-

rectors held "to the extreme measure of candor, unselfishness, and good faith").

Once interest is shown, directors' actions "are subject to strict judicial scrutiny, but are not voidable unless they are shown to be unfair to the corporation." *Gearhart*, 741 F.2d at 720. The burden of proof is on the interested director "to show that the action under fire is fair to the corporation." *Id.* In analyzing the fairness of directors' actions, a court should keep in mind that

> [a] director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their powers are powers of trust. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show *its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmark of an arm's length bargain. If it does not, equity will set it aside.*

*Id.* at 723 (quoting *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (Douglas, J.) (emphasis added)).

### C. Validity of the Poison Pill

■ The validity of the poison pill at issue in these cases can be viewed in two contexts: its validity at the time of adoption and its continued validity in light of events subsequent to adoption. Although the Defendant Directors *may* have acted in their own interest in adopting the pill, hoping to entrench themselves as Church's directors, adoption of the pill was not unfair to the corporation. Assuming the Defendant Directors sought to entrench themselves,[18] adoption of the pill appears to

---

17. Indeed, the district court found that the tender offeror had not shown that the directors authorized the debenture/warrants in an effort to entrench themselves on the board and thus, there was "absolutely no self-interest at play." *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 592 F.Supp. 203, 226 (N.D.Tex.1984).

18. The evidence presented to the Court probably would not support a finding that, at the time the pill was adopted, the Defendant Directors were acting to entrench themselves. The directors were under immense time pressure to respond to the tender offer and had obtained the opinion of Morgan Stanley, a well-respected investing banking firm, that the offer was inadequate.

have been fair to the corporation for at least three reasons. First, it bought the Defendant Directors time to negotiate for alternatives to Biscuit's tender offer. Second, it gave the Defendant Directors negotiating power to use in their dealings both with Biscuit and other potential purchasers. Third, it "propped up" the prices for Church's shares on the market, an effect which continues to date.[19] The Court shall therefore assume that the poison pill was valid at the time adopted.

As to the pill's continued validity in light of events subsequent to adoption, that is another matter. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 181 (Del.1986) (adoption of pill was valid but "its continued usefulness was rendered moot" by subsequent actions of the directors); *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1354 (Del.1985) (board has no more discretion in refusing to redeem a defensive mechanism than it does in enacting one). The most important event which has occurred since adoption is that the Defendant Directors have determined that a sale of Church's is in the best interest of the shareholders. A "full and fair auction" of the corporation is purportedly now ongoing.[20]

In light of this development, the Director Defendants' duty of loyalty is of increased importance. The Director Defendants are no longer "defenders of the corporate bastion"; they have become "auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon*, 506 A.2d at 182. Their duty of loyalty requires that "non-stockholder interests" be set aside. *Id.* Concern for such interests "is inappropriate when an auction among active bidders is in progress, and the object no longer is to protect or maintain the corporate enterprise but to sell it to the highest bidder." *Id.*

During the auction, the Court believes the Defendant Directors are not breaching their duty of loyalty, as described above, by keeping the poison pill in place. A poison pill, if properly used, "provides the directors with a shield to fend off coercive offers and with a gavel to run an auction." *CRTF v. Federated Dept. Stores, Inc.*, 683 F.Supp. 422, 439 (S.D.N.Y. 1988). After the auction is concluded, however, there will be no reason to keep the pill in place. The negotiating time the Defendant Directors bought with the pill will have expired. The negotiating power they acquired with the pill will have been expended. Any increase in market price achieved through the blocking of Biscuit's tender offer with the pill will probably disappear once that offer is withdrawn. *See supra* footnote 19. Because it would severely and immediately dilute the investment of anyone triggering its provisions, *see supra* footnote 7, allowing the pill to

---

The preliminary injunction hearing itself demonstrated just how difficult it can be, even in hindsight, to evaluate the adequacy of a tender offer.

**19.** *See Grand Metro. Pub. Ltd. Co. v. Pillsbury Co.*, Civil Action No. 10319, slip op. at 24 (Del.Ch. Dec. 16, 1988) (only factor supporting increase in stock price was tender offer itself and price would drop if tender offer withdrawn). As Church's counsel pointed out in their briefs and during the preliminary injunction hearing, since the adoption of the pill Church's stock has traded for a number of days at prices above Biscuit's $8 tender offer price. "The market" obviously believes Church's will be able to negotiate a deal better than that offered by Biscuit. If Church's fails to do this, it seems likely that Church's stock price will drop to a level more in line with the pre-tender offer price.

**20.** No party has cited any authority to the Court defining what constitutes a "full and fair auction." The Court assumes that, in light of its stated finding that "a sale of the company is in the best interests Church's shareholders," Church's is conducting its auction in good faith; truly intending to sell Church's to the highest bidder at the conclusion of the offer, whoever that bidder may be. If no one comes forward to top Biscuit's $8 tender offer, Biscuit would be the highest bidder. The Court does not believe that the auction is being advanced only as a litigation tactic to obstruct Biscuit's tender offer. *See Facet Enterprises, Inc. v. Prospect Group, Inc.*, Civil Action No. 9746, slip op. at 19 n. 10 (Del.Ch. Apr. 15, 1988) [1988 WL 36140]. If Church's does not intend to sell to the highest bidder, but rather plans to examine whatever bids are made and reject any or all of them because they do not meet some heretofore unstated requirements of Church's, the Court may not consider that a full and fair auction.

remain in place past the conclusion of the auction virtually insures that the auction will be unsuccessful and Church's current board will remain in place.

How does this relate to the Defendant Directors' alleged breach of their duty of loyalty? The Court cannot ignore that "when a board implements anti-takeover measures there arises 'the omnipresent specter that a board may be acting primarily in its own interest, rather than those of the corporation and its shareholders.'" *Revlon*, 506 A.2d at 180 (quoting *Unocal v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985)). If at the conclusion of the auction, when all benefits of the pill are gone, the pill is not redeemed, it will be clear that the Defendant Directors are keeping the pill in place for the sole purpose of entrenching themselves as Church's directors. The Defendant Directors will be interested directors whose actions are unfair to the corporation. They will have breached their duty of loyalty. The Court would conclude that both Biscuit and O'Neill would have a substantial likelihood of success on the merits of their cases.

On the other hand, if the Defendant Directors choose to redeem the poison pill when the auction concludes on February 18, 1989, they will arguably *not* have breached their duty of loyalty in that, at a minimum they will have allowed Biscuit's tender offer to go forward unimpeded. The Court would then conclude that neither Biscuit nor O'Neill have demonstrated a substantial likelihood of success on the merits.[21]

Unfortunate as it may seem to Biscuit and O'Neill, this Court is not prepared to grant a preliminary injunction contingent on whether or not the Defendant Directors choose to take an action. A preliminary injunction is a drastic and extreme remedy which should not be based on con-

tingencies. The Court shall therefore deny Biscuit and O'Neill's request for a preliminary injunction at this time in order to give the Defendant Directors an opportunity to conduct and complete the auction and to avoid potentially or further breaching their duty of loyalty by redeeming the poison pill at the conclusion of the auction. If, however, the poison pill is not redeemed by the Defendant Directors at the conclusion of the auction on February 18, 1989, the Court intends to enter a preliminary injunction ordering the pill redeemed.[22] Because this is the best course of action to follow, the Court will continue with its analysis of the preliminary injunction requirements as it relates to these cases.

## VI. IRREPARABLE HARM

If the poison pill is not redeemed so that Biscuit may pursue its tender offer, both Biscuit and O'Neill, a representative Church's shareholder, will suffer irreparable harm. Biscuit will have lost its opportunity to acquire Church's through its tender offer. Church's shareholders will have lost the opportunity to obtain an immediate $8 cash for their shares. There will be irreparable harm to Biscuit

> in that it cannot present to the shareholders of [Church's], in any meaningful way, its tender offer so long as this [poison pill] is in place. If the [poison pill] stays in place, [Biscuit] obviously cannot proceed. This is a disservice not only to [Biscuit], which constitutes irreparable harm, it is a disservice to the shareholders who are entitled to exercise their own value judgments with respect to the worth or lack of worth of the offer from [Biscuit].

*Amalgamated Sugar Co. v. NL Indus., Inc.*, 644 F.Supp. 1229, 1239 (S.D.N.Y. 1986), *aff'd* 825 F.2d 634 (2d Cir.1987); *see also Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250, 252 (7th Cir.1986)

---

21. The Court by no means intends to infer, if the Defendant Directors voluntarily redeem the poison pill, there would be no breach of the duty of loyalty. Rather, as the cases now stand, it appears that an argument of breach of the duty of loyalty would not be likely to succeed.

22. The Court will request that, should the Defendant Directors fail to redeem the pill, Biscuit and O'Neill submit proposed preliminary injunctions consistent with this order that could immediately be entered by the Court.

(Posner, J.) ("[i]f the tender offer is blocked, [the offeror] will lose an opportunity that may never recur"), *rev'd on other grounds,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *Asarco, Inc. v. M.R.H. Holmes A Court,* 611 F.Supp. 468, 480 (D.N.J.1985) ("[Plaintiff's] opportunity to make a tender offer will be limited by an unlawful device and correspondingly the opportunity of other shareholders to receive a tender offer will be impaired. All this constitutes irreparable injury.").

The Court is particularly concerned with the possible harm to shareholders. One court has succinctly stated the case for ultimately allowing shareholders to consider a tender offer:

> What is sometimes lost sight of in these tender offer controversies is that the shareholders, not the directors, have the right of franchise with respect to the shares owned by them; "stockholders, once informed of the facts, have a right to make their own decisions in matters pertaining to their economic self-interest, whether consonant with or contrary to the advice of others, whether such advice is tendered by management or outsiders or those motivated by self-interest." ...
> The Directors are free to continue by proper legal means to express to the shareholders their objection and hostility to the [offeror's] proposal, but they are not free to deny them their right to pass upon this offer or any other offer for the purchase of their shares.

*Conoco Inc. v. Seagram Co.,* 517 F.Supp. 1299, 1303 (S.D.N.Y.1981) (footnote omitted).

The Court finds that, should the Defendant Directors fail to redeem the poison pill and thus prevent Biscuit's tender offer from going forward, Biscuit and O'Neill would be irreparably harmed.

## VII. BALANCE OF HARMS

■ If Biscuit proceeds with and completes its tender offer, Church's will most likely be merged with Biscuit and/or Copeland. It does not appear to the Court that this would be of significant harm to Church's. The Defendant Directors will probably eventually be turned out of their jobs. This might constitute a significant harm to them. The Court does not, however, believe that if a preliminary injunction as requested by Biscuit and O'Neill were entered, the potential harm to Church's and the Defendant Directors would outweigh the harm to Biscuit and O'Neill described above if Biscuit cannot go forward with its tender offer.

## VIII. PUBLIC INTEREST

■ The Court finds that, should it become necessary, granting a preliminary injunction such as that requested by Biscuit and O'Neill would not disserve the public interest. The Court has taken into account in reaching its decision the interests of Biscuit, O'Neill, Church's shareholders generally, Church's, and the Defendant Directors. While the public may have some interest in preventing Biscuit's tender offer from going forward, in that a small portion of the public is employed by Church's and the public at large is benefitted by the presence of Church's in the community, this interest is outweighed by the interests of the parties to these actions and Church's shareholders. The Court has taken all of these interests into account in concluding that the public would not be disserved by the entry of a preliminary injunction ordering the poison pill redeemed.

## IX. CONCLUSION

Consistent with the findings made and conclusions reached above, it is hereby ORDERED that Plaintiff Biscuit Investments, Inc.'s Application for Preliminary Injunction and Plaintiff Dixie J. O'Neill's Motion for Preliminary Injunction are DENIED subject to reurging pursuant to this order.

SIGNED and ENTERED this 23rd day of February, 1989, nunc pro tunc February 9, 1989; it being the Court's intention that this Amended Order is effective as of the date of the Court's original Order, February 9, 1989, and replaces that original Order.